**ST. JOSEPH HISTORICAL SOCIETY,**
Plaintiff,

v.

**LAND CLEARANCE FOR REDEVELOPMENT AUTHORITY OF ST. JOSEPH, MISSOURI, et al., Defendants.**

Civ. No. 1715.

United States District Court,
W. D. Missouri,
St. Joseph Division.

Nov. 28, 1973.

David H. Morton, St. Joseph, Mo., for the plaintiff.

Joseph K. Houts, of Wilcox & Houts, St. Joseph, Mo., for defendants Land Clearance for Redevelopment Authority, Thomas Paul, Director, William Kenney, Chairman of L. C. R. A. and Bob Madget, Inc., St. Joseph, Mo.

Bert C. Hurn, U. S. Atty., by Vernon A. Poschel, Asst. U. S. Atty., Kansas City, Mo., for defendants William Southerland, Director, Area Office, Dept. of Housing and Urban Development, George Romney, Secretary of Dept. of Housing and Urban Development.

## MEMORANDUM AND ORDER DENYING INJUNCTIVE RELIEF AND DISMISSING PLAINTIFF'S COMPLAINT.

DUNCAN, Senior Judge.

Plaintiff, a non-profit corporation, organized in 1950 under Chapter 352 R.S. Mo.1949, V.A.M.S., seeks to enjoin the defendant Land Clearance for Redevelopment Authority of St. Joseph, Missouri, Bob Madget, Inc., Thomas Paul and William Kenney, and each of them, their agents and employees, from all demolition activities:

"1. * * * within the confines of Market Square Historic District until an Environmental Impact Statement is filed in accordance with The Environmental Policy Act of 1969 and the same has been administratively reviewed as required therein.

2. Order Defendants, William Southerland and George Kenney to cease any further funding of Urban Renewal Center Plan 1, Mo R–92 until such time as said impact statement has been filed and administratively reviewed, and to take all action necessary to secure the prompt filing of said impact statement.

3. Order all of said defendants to cease and desist from letting any further contracts for demolition in said District and to rescind or delay notice to demolish the building at 411 Edmond Street, St. Joseph, until such time as the required Environmental Impact Statement has been filed and finally reviewed."

The action is brought under The Environmental Policy Act of 1969, 83 Stat. 853, 42 U.S.C. § 4332(2)(C) and The National Historic Preservation Act of 1966, 80 Stat. 915, 16 U.S.C. § 470. Ju-

risdiction is alleged to be conferred upon this court by the Administrative Procedure Act, 5 U.S.C. § 702 and under 28 U.S.C. § 1343(3).

Market Square Historic District is located within the Center I Urban Renewal Project, Mo R–92, in the City of St. Joseph, and is an area bordered on the west by Market Place, on the east by the alley between 4th and 5th Streets, on the south by Edmond Street, and on the north by Felix Street.

The plaintiff alleges that it is the owner of the East 70 feet of the South 18 feet of Lot 8, Block 31 in Original Town, now City of St. Joseph. This property, located at 108 South Third Street, lies within the Market Square Historic District.

A review of the background of the project, is essential to a proper understanding of the question now before the court. On June 22, 1967 the Land Clearance for Redevelopment Authority of the City of St. Joseph was incorporated under §§ 99.300–99.660 R.S.Mo.1959 V.A.M.S.

On July 7, 1970 the City of St. Joseph and the Land Clearance for Redevelopment Authority entered into an agreement for the purpose of carrying out the Urban Renewal project in the City, including, but not limited to the so-called Center I Mo R–92 project.

The plan, described as "Project Mo R–92", had theretofore been finalized on August 7, 1969.

On June 26, 1970 an ordinance was passed by the City Council of St. Joseph authorizing a "cooperation agreement between the Land Clearance for Redevelopment Authority for the City of St. Joseph and the City of St. Joseph to be signed."

On July 7, 1970 the cooperation agreement was duly signed and executed between the Land Clearance for Redevelopment Authority and the City of St. Joseph. On September 29, 1970, pursuant to a special election the Urban Renewal Project was approved by the voters of the City of St. Joseph. On July 23, 1971 the execution of the Loan and Capital Grant Contract between the Land Clearance for Redevelopment Authority of the City of St. Joseph and the United States of America was duly executed.

The area encompassed by Project Mo R–92 included a substantial part of the downtown area of the City of St. Joseph, but we are here concerned only with that portion of the project lying within the Market Square Historic District.

Following the execution of the agreements which have heretofore been discussed, the Authority conducted a survey of the area and designated certain buildings for demolition and others to be improved, as shown by the various maps and reports introduced in evidence.

The defendant Bob Madget, Inc., has contracted to demolish approximately 70 buildings within the Project, including various buildings in the Market Square Historic District. More than 40 buildings had been demolished at the time this action was filed. The buildings under demolition contract in the District are located on the east side of Market Place, on the west side of Third Street and on the east side of 4th Street.

Prior to the time this suit was brought one of the buildings on the northeast corner of Third and Edmond Streets had been demolished and the building adjacent to it on the west had collapsed. The plaintiff contends that the building collapsed because of damage resulting from the demolition of the adjacent structure.

The square block between 3rd and 4th Streets now occupied by the First National Bank Building and its parking facilities, although included in the Market Square Historic District, has not been designated for demolition by the Authority, nor has the building known as the Missouri Valley Trust Company building, located on the southeast corner of 4th and Felix Streets.

On October 24, 1972 the case came on for hearing on the application of the plaintiff for a preliminary injunction filed on October 16, 1972. Both sides were granted an opportunity to submit

such evidence as they desired to present, and the court considered both the application for a preliminary injunction and for a permanent injunction.

The issues involved are strictly ones of law. The essential facts are not in dispute. The evidence before the court reveals that the structures standing in the Market Square District date back to the early days of St. Joseph. The buildings fronting on Market Place and on 3rd Street are especially associated with the early development of the City. The historic value of the property owned by the plaintiff, located at 108 South 3rd Street, is that it is alleged to have been the office of the Pony Express which started from St. Joseph in 1864, and the building in which the mail was gathered for forwarding to the western terminus of the Pony Express at Sacramento, California.

The evidence did not reveal that the other buildings had any esthetic value, but it is contended that they have interest from an architectural and structural viewpoint. The evidence further reveals that the building at 411 Edmond Street was originally built by Joseph Robidoux, the founder of the City of St. Joseph. The other buildings in that block that have been marked for demolition apparently have no special historical significance.

We are not here called upon to determine whether the buildings do or do not have historic, esthetic, architectural or structural value. We are only concerned with whether or not the legal procedural requirements were complied with, authorizing the Land Clearance for Redevelopment Authority to acquire such land and buildings to be dealt with in accordance with the Plan.

As we have heretofore stated, on July 23, 1971, the Land Clearance for Redevelopment Authority of the City of St. Joseph and the United States of America executed the Loan and Capital Grant Contract covering the Plan.

The Market Square Historic District was not placed in the National Register of Historic Places[1] by the St. Joseph Historical Society until March 17, 1972. Such addition was officially published in Volume 37 No. 85, page 8890 of the *Federal Register* on May 2, 1972. The lot located at 108 South 3rd Street now owned by the Historical Society was not acquired by it until June 30, 1972.

Title 16 U.S.C. § 470f provides:

"The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or department agency having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in the *National Register*. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation established under sections 470f[2]–470n of this title a reasonable opportunity to comment with regard to such undertaking." [Emphasis supplied]

 The wording of § 470f is clear and unambiguous in that it requires only that the head of the agency take into account the effect of the undertaking on *property included in the National*

---

1. 16 U.S.C. § 470a states in part:
 "The Secretary of the Interior is authorized—
 (1) to expand and maintain a national register of districts, sites, buildings, structures, and objects significant in American history, architecture, archeology, and culture, hereinafter referred to as the National Register,
 * * *."

2. The Advisory Council provided for in § 470i is composed of the Secretaries of Interior, Housing and Urban Development, Commerce, Treasury, Agriculture, Transportation, Smithsonian Institution, and the administrator of the General Services Administration, the Attorney General, the Chairman of the National Trust for Historic Preservation, and ten members from outside the federal government to be appointed by the President.

*Register.* Market Square Historic District was not in the National Register prior to approval of the project, and it was not necessary to "afford the Advisory Council on Historic Preservation . . . an opportunity to comment" with regard to a non-existent subject, namely, the property not included in the National Register. Where buildings are not placed on the National Register until after approval of the grant, protestants are not entitled to injunctive relief. South Hill Neighborhood Ass'n v. Romney, 421 F.2d 454 (6th Cir. 1969), cert. denied 392 U.S. 1025, 90 S.Ct. 1261, 25 L.Ed.2d 534; Kent County Council v. Romney, 304 F.Supp. 885 (W.D.Mich. 1969).

In his brief counsel for plaintiff recognizes the effect of the above cited authority on the plaintiff's right to injunctive relief. In an attempt to avoid its consequences, he submits:

"\* \* \* that the actions necessary to place the district on the National Register of Historic Places had commenced prior to the approval of the Urban Renewal Plan Mo R–92, and that therefore, it was necessary to comply with Section 470f of Title 16 of the United States Code, particularly with regard to the present separate action of L.C.R.A. in letting contracts for demolition of the Historic District (several months after registration of the District on the National Register of Historic Places) is the action complained about and should be prohibited under the National Historic Preservation Act."

The plaintiff further argues that even though the District was not listed in the National Register until after the Plan was approved it is protected under Chapter 55 of the National Environmental Policy Act, 42 U.S.C. §§ 4321–4332. This Act was passed by Congress in 1969 and became effective on January 1, 1970. Section 4321 declares the purpose of this Act to be:

"To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote effort which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality."

In invoking the provisions of the National Environmental Policy Act of 1969 the plaintiff contends that the requirements of § 470f of the National Historic Preservation Act of 1966 dealing with the protection of Historical Sites, Buildings, Objects and Antiquities, are broadened. In short, plaintiff insists that the 1969 Act protects buildings of architectural and historic significance whether or not they are listed in the National Register.

Section 4331(a) of the National Environmental Policy Act states:

"*Subchapter I.—Policies And Goals—* Congressional declaration of national environmental policy:

(a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influence of population growth, high-density urbanization, industrial expansion, resource exploitation, and new expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State, and local governments, and other concerned public and private organizations to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic and other requirements of present and future generations of Americans."

Section 4332, providing for the structural framework within which the 1969 Act is to be administered, states:

§ 4332. Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact on the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and comments and view of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

(D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(E) recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

(F) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(G) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(H) assist the Council on Environmental Quality established by subchapter II of this chapter."

Section 4341 provides that the President shall annually transmit an Environmental Quality Report to Congress. The report is to deal with numerous phases of our national resources, including, but not limited to, the air, the aquatic, and the terrestrial environment. The scope of the Act seems to be all inclusive, encompassing the entire spectrum of the sea, the earth and the sky.

In attempting to determine the intent of Congress in the enactment of this legislation we have studied the committee's report concerning the Act. U. S. Code Congressional and Administrative News, 91st First Sess. 1969, page 2751. The report is too voluminous to set out in substantial part, but we believe it is important to note that the bill (H.R.12549) was referred to the House Committee on Merchant Marine and Fisheries. That committee's report sets out that:

"The purpose of the bill, as hereby reported, is to create a Council on Environmental Quality with a broad and independent overview of current and long-term trends in the quality of our natural environment, to advise the President, and through him the Congress and the American people on steps which may and should be taken to improve the quality of the environment."

The Committee expressed its view that in achieving the purpose of the bill the Council on Environmental Quality would report to the President who in turn shall report to the Congress, advising it on "the various aspects of the American environment, as well as on the foreseeable trends that may affect that status, and on their impact on other national requirements."

Under the title "Background and Need for the Legislation" the Committee's report quoted an editorial appearing in the *New York Times* on May 3, 1969, as follows:

"By land, sea, and air, the enemies of man's survival relentlessly press their attack. The most dangerous of all these enemies is man's own undi-

rected technology. The radioactive poisons from nuclear tests, the runoff into rivers of nitrogen fertilizers, the smog from automobiles, the pesticides in the food chains, and the destruction of topsoil by strip mining are examples of the failure to foresee and control the untoward consequences of modern technology."

Dr. David M. Gates, Professor of Botany, at Washington University in St. Louis, Missouri, one of the committee's witnesses in hearings held on the legislation, stated that some of the questions the Council on Environmental Quality would have to answer are:

"Is the climate changing in an unnatural manner? Is there likely to be an oxygen shortage? Is population growth a part of some biological law which is incompatible with human dignity and desire? Can we feed the population of the world in the year 2000 or 2100 or 2200?"

The committee's report explains that the conference committee's substitute of the Senate bill provides:

"that the phrase 'to the fullest extent possible' applies with respect to those actions which Congress authorizes and directs to be done under both clauses (1) and (2) of section 102." 42 U.S. C. § 4332.

In the conference committee's substitute, the contents of section 105 of the Act (42 U.S.C. § 4335) are explained as follows:

"This section declares that the policies and goals set forth in the bill are supplementary to those set forth in existing authorities of Federal agencies. The effect of this Section, which is a slightly revised version of section 103 of the Senate bill, is to give recognition to the fact that the bill does not repeal existing law. This section does not, however, obviate the requirement that the Federal agencies conduct their activities in accordance with the provisions of this bill unless to do so would clearly violate their existing statutory authorizations."

The foregoing excerpts from the Committee Report and from the Conference Report are quoted solely for the purpose of attempting to determine the intention of Congress in the enactment of the legislation. We must conclude that this Act was clearly intended to apply to the overall environmental problems facing the Nation and that it was not intended to apply to situations such as exist in the case before us.

In support of its contention that the Environmental Policy Act is applicable to the present case the plaintiff cites Ely v. Velde, 321 F.Supp. 1088 (E.D.Va. 1971). In that case the plaintiff sought to enjoin the Federally assisted construction of a medical center for State prisoners, on approximately 10,000 acres of land in Louisa County, Virginia. The court described the area as being a "uniquely historical and architecturally significant rural community," in that almost all of the homes were built in the nineteenth century and had been maintained in substantially the same condition ever since." Three of the homes were listed on the National Register for Historic Places.

In denying the injunction in *Ely* the court held that while the provisions of Section 470, 16 U.S.C. were nondiscretionary the provisions of 42 U.S.C. § 4322 were merely discretionary. The court stated at page 1093:

"* * * while the Congress did not intend the clause in 42 U.S.C. § 4332, 'to the fullest extent possible' to be an escape provision, it is still discretionary."

The court did not apply § 470 or § 4332, reasoning that the provisions of those sections conflicted with the mandatory provisions of 42 U.S.C. § 3733 (the funding section of the Law Enforcement Assistance statute, 42 U.S.C. § 3711 et seq.

The *Ely* case was subsequently reversed on appeal at 451 F.2d 1130 (4th Cir. 1971). The appellate court held that before making the grant the Law Enforcement Assistance Administration (the administering agency of the Safe Streets Act) was required to comply with the provisions of § 470 and § 4332. The court stated at page 1136:

"It is our conclusion that Congress, in enacting the Safe Streets Act, did not intend to forbid the LEAA [Law Enforcement Assistance Administration] from considering NHPA [the National Historic Preservation Act] and NEPA [the National Environmental Protection Act]."

It is apparent that the *Ely* case can be distinguished from the present case in at least two important respects. First, the project under consideration in the *Ely* case involved three homes listed in the *National Register* at the time the grant was made by the agency, which clearly brought the project within the provisions of § 470f. In the present case none of the buildings were listed in the *National Register* at the time of the grant, and therefore the agency of Housing and Urban Development was not required to comply with the provisions of the National Historic Preservation Act. Second, the *Ely* project encompassed an extensive area of approximately 10,000 acres in a rural area. The present case involved an urban renewal plan covering a limited local area in the City of St. Joseph. We cannot therefore agree with the plaintiff's contention that the *Ely* case stands for the proposition that the provisions of §§ 470 and 4332 must be applied in the present case.

The law of which § 470f is a part, was enacted as a part of the general conservation laws of the Nation. They began with Title 16 Chapter I—National Parks, Military Parks, Monuments, and Seashores. Chapter II contains laws with reference to "national forests establishment and administrations." Chapter IA entitled "Historic Sites, Buildings, Objects and Antiquities" has been referred to in this case as the Act of 1966. It addresses itself specifically and directly to the subjects described in the title, contrasted to the broader aspects of § 4321 et seq.

It is our conclusion that § 4332 does not afford the plaintiff any right to have the project or the plan reviewed by the Council on Environmental Quality.

The injunctive relief sought by the plaintiff is denied and the complaint dismissed.

It is so ordered.