Stephen H. HART, State Preservation Officer, and State Historical Society of the State of Colorado, Appellees, Cross-Appellants,

v.

DENVER URBAN RENEWAL AUTHORITY et al., Appellants, Cross-Appellees.

Nos. 75–1909 to 75–1911.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted July 28, 1976.

Decided Jan. 6, 1977.

Rehearing Denied in No. 75–1909
May 5, 1977.

Paul C. Benedetti, of Benedetti, Opperman & Martinez, P. C., Denver, Colo., for appellant and cross-appellee, Denver Urban Renewal Authority.

Maryann Walsh, Atty., Dept. of Justice, Washington, D. C. (Peter R. Taft, Asst. Atty. Gen., Washington, D. C., James L. Treece, U. S. Atty., James W. Winchester, Asst. U. S. Atty., Denver, Colo., George R. Hyde and Kathryn A. Oberly, Attys., Dept. of Justice, Washington, D. C., on brief), for

appellants and cross-appellees, Dept. of Housing and Urban Development, and Carla Hills, Secretary of Dept. of Housing and Urban Development.

Janet Lee Miller, Asst. Atty. Gen., Denver, Colo. (J. D. MacFarlane, Atty. Gen., Jean E. Dubofsky, Deputy Atty. Gen., Edward G. Donovan, Sol. Gen., and Joseph M. Goldhammer, Asst. Atty. Gen., Denver, Colo., with her on brief), for appellees and cross-appellants.

Before SETH, BARRETT and DOYLE, Circuit Judges.

SETH, Circuit Judge.

These are appeals from a judgment enjoining the defendants, Denver Urban Renewal Authority (DURA), and the United States Department of Housing and Urban Development (HUD), from proceeding with the sale of the Daniels and Fisher Tower in Denver, Colorado, to a local architectural firm, Luff/McOG, which plans to renovate the Tower into office space as part of the HUD-funded Skyline Urban Renewal Project. The injunction is to remain in effect until HUD complies with the procedures required for certain historically significant properties in accordance with the regulations of HUD based on those of the Advisory Council on Historic Preservation, 36 C.F.R. § 800 et seq. Both parties have appealed.

The Skyline Urban Renewal Project, which called for renovation of a large area in downtown Denver, was officially approved by HUD on March 7, 1968, when HUD and DURA entered into a Project Loan and Capital Grant Contract. Included in the project area is the Daniels and Fisher Tower (Tower), built in 1911 as part of the Daniels and Fisher Department Store. The Tower was patterned after the Campanile in St. Mark's Square, Venice. The department store building was demolished as part of the project, but the Tower was left standing. On December 2, 1969, the Tower was added to the National Register of Historic Places. The Register, established by the National Historic Preservation Act of 1966 (NHPA), 16 U.S.C. §§ 470 et seq.,

recognizes and preserves objects significant in American history, architecture, archaeology, and culture.

The Project called for renovation of the Tower as commercial space. In furtherance of that plan, DURA purchased the Tower on April 16, 1970, and offered it for sale to area redevelopers. Two earlier other purchasers, after acceptance of their proposals by DURA, did not complete their contracts. On April 16, 1975, DURA and Luff/McOG, one of the defendants here, entered into an agreement for the purchase and sale of the Tower. It is this sale that was enjoined by the district court pending compliance with HUD regulations implementing NHPA, 36 C.F.R. §§ 800.1 et seq.

Defendants below appeal the final order granting that injunction. Plaintiffs cross-appeal the trial court's conclusions that NEPA and the regulations drafted under its authority do not apply.

Plaintiffs' cross-appeal is based on the premise that the district court reached the right decision for the wrong reasons. In granting the injunction, the court held neither NHPA nor NEPA applied, but rather the HUD-approved regulations under NHPA activated the procedural requirements set out in NHPA. The plaintiffs would have us find not only the regulations but also the two Acts themselves are applicable here.

In reviewing those two Acts, we must conclude that NHPA does not apply to this case. The relevant section reads:

"The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking shall, *prior to the approval of the expenditure of any Federal funds on the undertaking* or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in the National Register. The head of any such

Federal agency shall afford the Advisory Council on Historic Preservation established under sections 470i to 470n of this title a reasonable opportunity to comment with regard to such undertaking." 16 U.S.C. § 470f. (Emphasis added).

■ Plaintiffs read this section to require HUD to seek comment from the Advisory Council. However, the plain meaning of the words exempts the Tower sale from such a consideration. The Tower was not placed on the National Register until 1969, while the approval of the expenditure of Federal funds for the Skyline Urban Renewal Project was finalized by the signing of the loan and capital grant contract on March 7, 1968. The use of that contract date as the time at which this provision becomes effective has been established in other jurisdictions. *See South Hill Neighborhood Ass'n v. Romney*, 421 F.2d 454 (6th Cir.); *St. Joseph Historical Society v. Land Clearance for Redev. Au.*, 366 F.Supp. 605 (W.D.Mo.); *Kent County Council for Historic Preservation v. Romney*, 304 F.Supp. 885 (W.D.Mich.). The analysis in each appears sound. The language of the Act is clear, particularly when compared to the comparable section of NEPA. The reading proposed by plaintiffs is strained and not in accordance with the plain meaning of the section. If in fact the key element is not approval, as the case law and the ordinary words suggest, but is the expenditure of funds, the last expenditure of federal funds involving the Tower occurred in September of 1970, when DURA purchased the Tower from a private owner. However, this is not the "expenditure" contemplated in the statute. Plaintiffs would have us use the date DURA entered into the sale contract with Luff/McOG in April 1975 as the critical date. However, no federal funds were to be expended in that sale, and thus there was no expenditure to be approved and the statute by its terms does not apply.

Plaintiffs make one further argument to apply NHPA, arguing that major amendments to the plan in 1971 and 1972 invoke the Act's provisions. The district court found the 1972 amendment, which involved a change in density allotment, had nothing to do with the Tower while the 1971 amendment, which called attention to the Tower's listing on the National Register, became effective without HUD approval. Neither caused the Act to apply.

We thus agree with the district court that NHPA did not require HUD's solicitation of comments from the Advisory Council as to DURA's agreement to sell the Tower to Luff/McOG.

■ The issue as to the application of NEPA is not so clear. The pertinent statutory provision states:

"The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

\* \* \* \* \* \*

"(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

"(i) the environmental impact of the proposed action,

"(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

"(iii) alternatives to the proposed action,

"(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

"(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332.

Here the "plain meaning" is not so plain. Case law under this provision finds the catch phrases, "to the fullest extent possible" and "major Federal actions" subject to several interpretations.

In determining legislative intent, the first phrase becomes significant. It has been interpreted by one court to establish a discretionary element in the Act which the court reads further as indicative of intent to apply the Act to overall environmental problems facing the Nation as a whole as opposed to demolition of specific historic buildings. *St. Joseph Historical Society v. Land Clearance for Redev. Au.,* 366 F.Supp. 605 (W.D.Mo.). The majority, however, have read that phrase as subjecting a continuing project to the Act's requirements until it reaches ". . . that stage of completion where the cost of abandoning or altering the proposed project clearly outweigh [sic] the benefits [of] compliance." *Arlington Coalition on Transportation v. Volpe,* 458 F.2d 1323 (4th Cir.), cited in *Swain v. Brinegar,* 517 F.2d 766 (7th Cir.). Although these two cases involved highway construction projects rather than urban renewal plans, the theory remains the same. They hold that as long as agency decisions remain to be made or are open to revision, the Act should be applied. It is at this point that the phrase "major Federal action" comes into play. The determination to be made in the instant case is whether the loan and capital grant contract's requirement that HUD approve all acquisitions and dispositions of property by the DURA, section 108(A)(11), (12), (16) of that contract, establishes major Federal action sufficient to mandate compliance with the Act each time that approval is given. The district court held that all major Federal action taken here occurred before the Act was in effect. In order to do so, the court found the signing of the loan and capital grant contract as the only major Federal action involved in this urban renewal project.

A review of case law interpreting the phrase "major Federal action" does not compel this restrictive conclusion. Judicial decisions in a variety of actions in which federal agencies and funds are involved have given a broad reading to the key phrase. Highway construction suits, challenged by defendants here as distinguishable simply because they deal with a high-

way being built rather than a Tower being renovated, have expressed the philosophy behind the Act to be long-range. In one, the date of design approval, the first of five established stages in highway construction and comparable to the signing of the loan and capital grant contract here, was rejected as the critical stage beyond which the court would not halt work to require reconsideration and the preparation of an Environmental Impact Statement. (EIS). *Arlington Coalition on Transportation v. Volpe, supra.* Further, that court ruled that the determination as to whether that point had been reached must be resolved in favor of the statute's applicability. *Ibid.* The court concluded that the continuing responsibility of the federal agency involved in approving specifications and estimates, along with the awarding of construction contracts, was sufficient major Federal action to require reconsideration of the plans and the filing of an EIS as required by NEPA.

This continuing federal involvement has also been recognized in actions in which the court has found the federal agency in compliance. In reviewing the Secretary of the Interior's actions in connection with construction of electric generating facilities, the Ninth Circuit found major federal actions subsequent to the National Project Participation Agreement, which was entered into prior to NEPA's effective date. *Jicarilla Apache Tribe of Indians v. Morton,* 471 F.2d 1275 (9th Cir.). The approval of rights-of-way and easements for the coalhaul railroad and the approval of stack heights, considered by the court to be federal actions, were both given in 1971, which made them subject to the Act. At the same time, however, a draft EIS was being prepared which indicated consideration of environmental factors prior to each approval, so the court found the agency in compliance. The court emphasized the continuing nature of the compliance, stating:

". . . The fact that it is not practicable to reassess the basic course of action does not mean that an environmental impact statement need not be

filed prior to a further major action taken pursuant to that basic course of action. . . . The focus must lie on the practicability of adherence to the requirements of § 102(2)(C) [§ 4332(2)(C)] as regards *each* major federal action contemplated, not on the project as an entirety." Ibid., 1282–1283. (Emphasis the court's).

Several cases dealing specifically with urban renewal projects have adopted the theory just set forth. In a challenge to the complex area renewal project in the city of Boston for which no impact statement had been filed, the First Circuit remanded the case to the district court to make findings regarding the status of amendments to the contract made after NEPA's effective date as major federal actions. *Jones v. Lynn,* 477 F.2d 885 (1st Cir.). The plan had been initially approved in 1967, but in 1970 the contract was amended to allow an authorized increase in the interest paid on temporary loan notes and in 1972 to increase the relocation grant and the temporary loan authorization. The court there rejected arguments that Congress intended to exempt projects whose plans had previously been approved from NEPA coverage, finding the "continuing responsibility" language of section 4331 as well as the "to the fullest extent possible" phrasing of section 4332 to indicate an environmental role for a federal agency as long as it remains meaningfully involved in a project. In another suit involving urban renewal in Boston, the district court found that with one-third of the original funding still to be disbursed, there was major federal action contemplated sufficient to justify the granting of a preliminary injunction halting demolition of the threatened buildings. *Boston Waterfront Residents Ass'n, Inc. v. Romney,* 343 F.Supp. 89 (D.Mass.). *See also Save the Courthouse Committee v. Lynn,* 408 F.Supp. 1323 (S.D.N.Y.).

With this ongoing project, the application of NEPA must be considered in relation to the particular matter or structure being evaluated. We are concerned with the historical value of a single structure in a very large project. This can certainly be separated from the other elements and the burden of compliance with the regulations compared with any interference or stoppage of the project or of substantial elements. HUD has treated this building separately in its negotiations and administratively as evidenced by the fact it was not demolished and has been contracted to be sold as a separate structure. This balancing is the theory of the cited highway cases and the Boston cases, and is certainly a realistic and practical view. This is what the trial court concluded. Furthermore, this is no more than what the HUD regulations contemplate.

The judgment of the trial court is AFFIRMED for the reasons herein set forth.