603 F.2d 310
 9 Envtl. L. Rep. 20,565
 CA 79-2516 WATCH (WATERBURY ACTION TO CONSERVE OUR HERITAGE
INCORPORATED), Appellee-Cross Appellant,
v.
Patricia Roberts HARRIS, Individually and as Secretary,
United States Department of Housing and Urban Development,
Edward T. Martin, Regional Administrator, Region 1, United
States Department of Housing and Urban Development, Lawrence
Thompson, Area Director, United States Department of Housing
and Urban Development, Appellees,
Waterbury Urban Renewal Agency, Appellant-Cross Appellee.
 Nos. 858, 931, Dockets 79-7030, 79-7100.
 United States Court of Appeals,
Second Circuit.
 Argued March 19, 1979.
Decided June 25, 1979.
 
 James E. Hartley, Jr., William J. Secor, Jr., Secor, Cassidy & McPartland, P. C., Waterbury, Conn., for appellant-cross appellee.
 William Howard, Shaw & Howard, Middletown, Conn. (John F. Shaw, Jr., Middletown, Conn., on brief), for appellee-cross appellant.
 James W. Moorman, Asst. Atty. Gen., Washington, D. C., Richard Blumenthal, U. S. Atty. for the District of Connecticut, New Haven, Conn., George J. Kelly, Jr., Asst. U. S. Atty., Hartford, Conn., Robert L. Klarquist, John J. Zimmerman, Attys., Dept. of Justice, Washington, D. C., memorandum for the federal appellees.
 Before LUMBARD and OAKES, Circuit Judges, and BRIEANT, District Judge.*
 OAKES, Circuit Judge:
 
 
 1
 An ongoing urban renewal project in the heart of a small New England city has evidently awakened in the minds and hearts of local citizens concern about the historical heritage that the project impinges upon. The citizens formed the plaintiff organization by the acronym WATCH, Waterbury Action to Conserve Our Heritage, Inc., and the organization brought suit against three individual federal officials, the Secretary, Regional Administrator, and Area Director of the United States Department of Housing and Urban Development, hereinafter collectively called HUD, and against the Waterbury Urban Renewal Agency (WURA), defendant below and appellant here. The Central Business District Renewal Project No. Conn. R-107 (the Project) contemplated the demolition of a number of buildings in a twenty-acre area. In seeking to stop that demolition WATCH below urged that defendants had not complied with the requirements of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq., the National Historic Preservation Act (NHPA), 16 U.S.C. § 470 et seq., and certain regulations of HUD and of the Advisory Council on Historic Preservation.[1] In a careful and comprehensive opinion, the United States District Court for the District of Connecticut, T. Emmet Claire, Chief Judge, held that NEPA was applicable but that, because the loan and capital grant contract was executed before any affected properties were listed in the National Register, NHPA was not. He also held that subsequent regulations of the Advisory Council on Historic Preservation, Supra note 1, could not apply because they would be "inconsistent" with NHPA, the underlying statute. Accordingly, the court granted WATCH's motion for a preliminary injunction to restrain the defendants from proceeding with the Project.
 
 
 2
 WURA appeals from the grant of the preliminary injunction. In a cross-appeal and pursuant to our certification of the issue under 28 U.S.C. § 1292(b), WATCH urges that NHPA is applicable to the Project. HUD does not appeal the grant of the injunction but has filed a memorandum disputing WURA's arguments that NEPA does not apply or that if it does apply it conflicts with NHPA. The parties have now stipulated that the hearing before the district court on the preliminary injunction can be considered as a hearing on the merits. Cf. Fed.R.Civ.P. 65(a)(2). We commend counsel for this expediting and cost-saving agreement, which we assume that the district court will accept. Thus we need not discuss "probability of success," "irreparable injury," or other elements of the preliminary injunction test[2] but will proceed to the merits of the legal issues.
 
 BACKGROUND
 
 3
 The City of Waterbury, after workshop sessions, meetings, public hearings, and the like, adopted an urban renewal plan to rehabilitate an area of 20.6 acres in downtown Waterbury north of Interstate 84. On May 11, 1973, WURA and HUD executed a Loan and Capital Grant Contract (the Contract), pursuant to which HUD was to give WURA project loans aggregating in excess of $12,800,000 and a capital grant in excess of $11,500,000. The plan calls for demolition of 83 of some 113 buildings in the project area and for the construction of high rise, high density commercial and office space. The project is still far from completion. As of January 28, 1977, 55% Of the land had been acquired; 35% Of the buildings had been demolished; although no land had been disposed of, project improvements were 25% Complete; and relocation was 45% Complete.[3] As of November 28, 1978, 27 of the buildings scheduled for demolition remained standing. WURA's executive director testified that as of November 1978, WURA had spent only $12 million of the total cost of the project; that WURA has not disposed of or agreed to convey some of the real estate on which the remaining buildings scheduled for demolition sit; that WURA has not even acquired certain property from private owners; and that a number of the remaining buildings scheduled for demolition are occupied by tenants of WURA.
 
 
 4
 It is of some importance to the resolution of this case that under the Contract the work is done in phases, each of which requires HUD's permission. Under Section 108(A) of the Contract, WURA is required promptly to submit to HUD documentary data with respect to any action that WURA proposes to take in carrying out the Project. Section 108(B) further provides:
 
 
 5
 (HUD) may elect not to make a requested payment . . . if, after (WURA) shall have furnished any item covered by and in accordance with Section 108(A) hereof, (WURA) shall have proceeded further with respect thereto without having been advised in writing by the Secretary to the effect that (HUD) has no objection to (WURA's) so proceeding.
 
 
 6
 Thus, the acquisition of properties, the demolition of buildings, and changes in the urban renewal plan all require HUD's on-going permission. Section 108(B) explains that this permission is necessary to insure that the "Agency (WURA) shall not take any step which might, in the opinion of the Secretary (of HUD), violate applicable Federal laws or regulations . . ."[4]
 
 
 7
 In the eyes of WATCH, the buildings in the project area possess historical interest because they are "of a classic turn-of-the-century main street type," representing an eclectic collection of architectural styles including Renaissance revival, Richardsonian romanesque, Greek revival, and Italianate. The cultural, social, architectural, and historic significance of the neighborhood escaped the attention of the local citizenry at least they were not moved by the writings of Ada Louise Huxtable until December 1, 1976,[5] when the Waterbury Commission on Aging suggested to the State Historic Preservation office that the H. H. Peck carriage house, located within the Project area, be considered for listing on the National Register of historic places.[6] When on May 6, 1976, WURA forwarded to HUD's area office HUD Form ECO-1 setting forth the applicant's environmental information with respect to the project area, WURA stated that "(t)here are no known significant historic, archaeological, or architectural sites or properties listed on, or being considered for nomination to, the National Register of Historic Places." Similarly there were no responses to HUD's legal advertisements on January 5, 1977, in two Waterbury newspapers that HUD was performing an environmental assessment of the Project and was inviting comment by January 20.
 
 
 8
 On January 28, 1977, HUD completed its Special Environmental Clearance for the Project, observing that "(t)here are no properties listed or nominated to the National Register of historical places." Based on this Clearance, HUD concluded that there was no significant environmental impact and that the processing of the Project could proceed. But HUD did not consult with the State Historic Preservation office (SHPO) about eligible properties before preparing the Clearance, and there was disputed testimony that it also did not consult about listed or nominated properties. Neither the ECO-1 nor the Clearance expressly considered alternatives to demolition of buildings designated for demolition in the Project area. HUD did not prepare an environmental impact statement for the Project area and did not consult with the national Advisory Council on Historic Preservation.
 
 
 9
 However, on April 21, 1977, WURA did transmit information to HUD about the potential eligibility of the carriage house. On December 29, 1977, HUD wrote to the Department of Interior and expressed its finding that the house was not eligible but requested a determination from the Department. The Keeper of the National Register determined that the house was eligible on February 7, 1978. In late December, 1977, attorneys for members of WATCH who owned property in the Project area wrote to HUD demanding National Register eligibility determinations with respect to all the commercial buildings in the Project area. On January 18, 1978, HUD ordered a "freeze," I. e., that no federally assisted acquisition, disposition, renovation, or demolition be conducted on any structure within the Project area until the area office had made a Register eligibility determination. The Advisory Council on Historic Preservation subsequently informed the HUD area office that it had become aware of the Project and requested an evaluation of the significance of the central business district. The State Historic Preservation officer on March 22, 1978, also wrote to the HUD area office stating that he had made a field inspection in February and concluding that several portions of the area were eligible for inclusion, because the area was "a substantially intact 19th century commercial district," one of the more complete 19th century downtown areas in Connecticut, and some of the buildings were "outstanding examples of their types."
 
 
 10
 The "freeze" lasted from January 18, 1978, to August 31, 1978, while HUD inspected the project and gathered data. In September, 1978, HUD terminated its attempts to obtain Register eligibility determinations and recommenced demolition. At this point SHPO informed the Deputy Assistant Secretary of HUD that it had not been consulted and suggested an immediate review of HUD's decision not to seek an eligibility determination. WURA has evidently entered into a contract for the demolition of the remaining buildings scheduled for demolition. WATCH brought suit in October, 1978, and the district court granted a preliminary injunction on December 22, 1978.
 
 
 11
 THE DECISION OF THE COURT BELOW AND CONTENTIONS OF THE PARTIES
 
 
 12
 The district court held that the plaintiff WATCH had standing to sue, a decision which is not challenged on the appeal, and that the plaintiffs were not guilty of laches because the buildings about which they were concerned had not yet been demolished and because the plaintiffs could properly rely upon the federal agencies' performing their statutory duties. This decision was surely correct in view of the public interest in preserving the historic sites that remain and the continuing nature of HUD's supervision over acquisition, demolition, and other project activities, See note 4 Supra. Compare Steubing v. Brinegar, 511 F.2d 489, 495 (2d Cir. 1975), With City of Rochester v. United States Postal Service, 541 F.2d 967, 977 (2d Cir. 1976). On the merits, Judge Clarie held that NHPA was inapplicable, that Advisory Council and HUD regulations, See note 1 Supra, were either inapplicable or invalid, but that NEPA did apply.
 
 
 13
 Judge Clarie concluded the NHPA was inapplicable because in 1973, when the contract here was executed, Section 106, 16 U.S.C. § 470f, provided that "(t) he head of any Federal agency . . . shall, prior to the approval of the expenditure of any Federal funds on the undertaking . . . take into account the effect of the undertaking on any district, site, building, structure or object that is included in the National Register."[7] Although the statute was amended in 1976 to refer to property "includ(ing) in Or eligible for inclusion in the National Register" (emphasis added), the language "prior to the approval of the expenditure of any Federal funds" remained. As Judge Clarie duly noted, a number of federal courts, in reviewing NHPA challenges to federally assisted urban renewal projects, have interpreted the "approval" language to mean the time when a grant and loan contract is executed.[8] Because no properties in the Project area were listed when the Contract was signed, Judge Clarie reasoned, NHPA imposes no present duty upon HUD to consider the effect of the Project on eligible properties or properties listed after 1973.
 
 
 14
 The court next addressed the applicability of HUD regulations. Pursuant to Executive Order 11593, 36 Fed.Reg. 8921 (1971), directing federal agencies to adopt procedures to assure that federal programs contribute to historic preservation, HUD incorporated by reference the guidelines which the Advisory Council on Historic Preservation had promulgated. See note 1 Supra. Under the authority of NHPA, these guidelines originally established procedures for determining whether a federally assisted undertaking had an effect on a listed property. 38 Fed.Reg. 5388 (1973). Under the authority of Executive Order 11593 and NEPA as well as NHPA, the Advisory Council revised the regulations effective January 25, 1974. 39 Fed.Reg. 3366. The guidelines, which have not been subsequently amended, are published at 36 C.F.R. § 800.
 
 
 15
 The district court noted that these revised guidelines
 
 
 16
 differ from NHPA in two important respects. First, even prior to the 1976 amendment to § 470f, the Guidelines directed that the federal agency consider the effect of any proposed undertaking on properties "that are included in Or eligible for inclusion in the National Register." 36 C.F.R. § 800.4 (emphasis supplied). Second, the Guidelines mandate continuing compliance with the Act, even after the date of signing the Loan and Capital Grant Contract, as long as the federal agency retains any authority to make changes in the project which could alter its impact on historical and cultural properties. 36 C.F.R. § 800.3(c) and (g).[9]
 
 
 17
 WATCH v. Harris, No. H-78-539 (D.Conn. Dec. 22, 1978), at 13. But the court concluded that these guidelines were inapplicable, noting that they did not require agencies to consider eligible properties until 1974, when the contract had already been executed. The court further stated that the guidelines, even if applicable, were invalid because they exceeded the scope of NHPA.
 
 
 18
 Judge Clarie went on to find, however, that NEPA did apply. He reasoned that the granting of approval for acquisition or demolition of any property was a "major federal action" within the meaning of 42 U.S.C. § 4332[10] and pointed out that the courts[11] have construed this language and that of 42 U.S.C. § 4331(b)[12] to mean that a federal agency must comply with NEPA so long as it retains, as HUD did here, significant control over the project. The judge noted that HUD recognized its continuing responsibility when it imposed a "freeze" on the Project. He found that once new information (the potential eligibility of several structures for listing) was made available, HUD should have conducted a new "threshold" determination as to whether an environmental impact statement was required. If as a result of this threshold determination HUD had decided that Register-eligible properties would be affected, then a detailed environmental impact statement would be required under the case law. The judge also referred to the necessity for notice and public comment prior to the determination under this court's decision in Hanly v. Kleindienst, 471 F.2d 823, 836 (2d Cir. 1972), Cert. denied, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973), and to this court's requirement that the agency give sound reasons for any determination that structures are not in fact Register-eligible or will not be adversely affected. City of Rochester v. United States Postal Service, supra, 541 F.2d at 973.
 
 
 19
 WATCH seeks to uphold the district court decision in respect to NEPA but contends in respect to NHPA that the cases construing Section 106 to call for a cut-off date as of the date of the loan and capital grant agreement, note 8 Supra, have been erroneously decided. In the view of WATCH, Section 106 "applies to require Advisory Council review as long as HUD retains the control to make approvals pursuant to the grant-loan Contract." WATCH also argues that the guidelines of the Advisory Council do apply because they are procedural, irrespective of any construction of the Act itself; because they were promulgated before HUD made its environmental assessment in 1977;[13] and because the Handbook was adopted pursuant to NEPA and Executive Order 11593 as well as NHPA.
 
 
 20
 In this appeal, WURA makes an argument that it could not have made in the district court.[14] According to WURA, the district judge was clearly correct in construing NHPA to have an arbitrary cut-off date as of the time the contract was executed and in stating that the procedures of the Advisory Council, whether or not adopted by HUD, note 1 Supra, could not affect this statutory interpretation. But, WURA argues, if NHPA is inapplicable, NEPA must also be inapplicable, for several reasons. First, notwithstanding the specific language in Section 101(b) of NEPA, Supra note 12, WURA asserts that NHPA is the only federal statute applicable to historic preservation. Second, WURA relies upon a series of cases involving the air and water pollution acts and stating that where an act is the "functional equivalent" of NEPA, NEPA is not applicable.[15] Third, WURA argues that if an environmental impact statement is required, NEPA is in conflict with NHPA and thus should not be enforced, under the Supreme Court decision in Flint Ridge Development Co. v. Scenic Rivers Association, 426 U.S. 776, 96 S.Ct. 2430, 99 L.Ed.2d 205 (1976) (holding that the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1701, displaces NEPA where they are in direct conflict).[16]
 
 
 21
 WURA also argues that even if NEPA applies, HUD followed its own regulations; thus HUD's determination that an environmental impact statement did not have to be prepared was not arbitrary, capricious, or otherwise not in accordance with law.
 
 
 22
 On this appeal HUD now takes a position contrary to WURA, arguing that Congress has incorporated considerations of historic preservation into NEPA,[17] that NHPA is not the functional equivalent of NEPA,[18] and finally that there is no irreconcilable conflict between NHPA and NEPA that would justify exempting from the operation of Section 102(2)(C) of NEPA an urban renewal project which might have a significant effect on historic resources.
 
 DISCUSSION
 
 23
 We take up the NHPA question first because if WATCH is correct that NHPA has been erroneously construed, both the supposed conflict that the court found between the statute and regulations and the supposed conflict that WURA urges between NHPA and NEPA disappear. We do this in recognition of the principle of statutory construction that "when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." Morton v. Mancari, 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974).
 
 A. NHPA
 
 24
 Whether NHPA § 106, 16 U.S.C. § 470f, is applicable here depends upon whether the court below was correct in holding that the execution of the loan and grant contract was, within the meaning of the statute, "the approval of the expenditure of any federal funds on the undertaking . . . ." and the Only such approval. If it were, then the "cut-off" date for compliance with NHPA was the time of the execution of the loan and grant contract; and because no properties were nominated to, or even considered eligible for listing on, much less listed on, the National Register as of that date, NHPA would clearly not apply. But one might distinguish between a contract that upon execution constitutes final approval of all expenditures of federal funds and a contract such as the one involved here that provides for subsequent approval in stages or phases of specific expenditures which the initial contract has only preliminarily authorized. Without much discussion, the decided cases appear to have assumed that in either kind of contract the cut-off date is the time of execution. See note 8 Supra. We conclude, however, that the provisions of NHPA do not cease to apply simply because an agency has preliminarily approved expenditures. Those provisions should apply until the agency has finally approved the expenditure of funds at each stage of the undertaking. Because our conclusion differs from that of most courts that have addressed the question, our reasoning must be stated with care.
 
 
 25
 We begin with the language of the statute. The clues to its meaning, unfortunately, are few and ambiguous. Some do suggest that even a preliminary authorization amounts to a cut-off. Thus the first sentence of § 106 states that a federal agency having jurisdiction over a "Proposed Federal or federally assisted undertaking" (emphasis added) shall consider its effect on listed properties. And the language "any" in the phrase "prior to the approval of the expenditure of any Federal funds" might refer to the initial funding only. On the other hand, the language also supports the interpretation that the preliminary approval is not a cut-off. The term "proposed" might simply be shorthand for "proposed or continuing," and "any" might mean any expenditure of federal funds, not the expenditure of initial funds. Moreover, if the statute intended to establish a cut-off once an agency gave preliminary approval to expenditures, one might expect it to read "prior to the approval of the undertaking," rather than "prior to the approval of the expenditure of any Federal funds on the undertaking."[19] Finally, it is possible to interpret the term "undertaking" as referring not simply to an urban renewal project but to each of the project's several phases.[20]
 
 
 26
 Because we believe that the words of the statute are susceptible to either reading, we must look to other guides to ascertain the true congressional intent. In doing so, we must be cognizant of the principle that although legislative history may serve as a guide to the actual purpose of Congress in enacting a law, it is that purpose which we must keep uppermost in mind.[21]
 
 
 27
 Congress never explicitly considered the specific problem before us, so far as the recorded legislative history of the initial National Historic Preservation Act, Pub.L.No.89-665, Title I, 80 Stat. 915 (1966), and the 1976 amendments thereto, Act of Sept. 28, 1976, Pub.L.No.94-422, Title II, 90 Stat. 1320, disclose. Nevertheless the legislative history does shed light on the underlying problems that Congress attempted to meet and its method of meeting them; the history therefore helps "to manifest (congressional) purposes in their completeness . . . ."[22]
 
 
 28
 Congressional interest in historic preservation has been longstanding. H.R.Rep.No.1916, 89th Cong., 2d Sess., 1966 U.S.Code Cong. & Admin.News, pp. 3307, 3308. The Antiquities Act of 1906, 16 U.S.C. § 431 et seq., authorized the President to set aside national monuments on lands controlled by the United States.[23] The Historic Sites Act, 16 U.S.C. § 461, adopted in 1935, declared that "it is a national policy to preserve for public use historic sites, buildings, and objects of national significance for the inspiration and benefit of the people of the United States" and established the Advisory Board on National Parks, Historic Sites, Buildings, and Monuments. In 1949 Congress chartered the National Trust for Historic Preservation in the United States, a nonprofit corporation, "to facilitate public participation in the preservation of sites, buildings, and objects of national significance or interest," and empowered it to accept and administer donated properties and funds. 16 U.S.C. § 468. And in 1965 Congress recognized that urban renewal projects might have an impact on historic sites because the Housing and Urban Development Act of that year permitted a project to relocate "within the project area a structure which the local public agency determines to be of historic value and which will be disposed of to a public body or a private nonprofit organization which will renovate and maintain such structure for historic purposes." Pub.L.No.89-117, Title III, § 309(a), 79 Stat. 477 (1965) (prior to 1966 amendment).[24]
 
 
 29
 But it was not until a United States Conference of Mayors study by a special committee on historic preservation, entitled "With Heritage So Rich," that Congress, in enacting NHPA, took the key step of protecting not only "nationally significant' properties but also properties of "historical, architectural, or cultural significance at the community, State or regional level . . . against the force of the wrecking ball." H.R.Rep.No.1916, Supra, 1966 U.S.Code Cong. & Admin.News at p. 3309. The House Report emphasized the importance of focusing attention on the significance of such community, state or regional properties, specifically in "the urban renewal field," and of striking a "meaningful balance . . . between preservation of these important elements of our heritage and new construction . . . ." Id. The proposed NHPA had a threefold purpose, according to the House Report:
 
 
 30
 (1) to strengthen and expand the work being done under section 2(b) of the act of August 21, 1935 . . . and to establish a national register of sites, structures, and the like which are significant in American history, architecture, archeology, and culture; (2) to encourage local, regional, State, and National interest in the protection of such properties; and (3) to establish an Advisory Council on Historic Preservation charged with the duties of advising the President and the Congress on matters relating to preservation of such properties, recommending measures to coordinate public and private preservation efforts, and reviewing plans for Federal undertakings and the undertakings of others involving Federal assistance or requiring a Federal license which affect sites, structures, and the like listed in the national register referred to above.
 
 
 31
 H.R.Rep.No.1916, Supra, 1966 U.S.Code Cong. & Admin.News at pp. 3307-08.
 
 
 32
 The legislative history of § 106 begins with S.3098, which Senator Edmund Muskie introduced on March 17, 1966. Section 202 of that bill provided:
 
 
 33
 The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted project in any State shall, prior to the approval of the expenditure of any Federal funds on the project, take into account the effect of the project on any site, building, or object of national significance that is included in the national register established under section 101(a) of this Act.
 
 
 34
 The executive branch secured the introduction of S.3035 on March 2, 1966, but the bill contained no comparable provision. In a letter of June 7, 1966, to the Chairman of the Senate Committee on Interior and Insular Affairs, the Deputy Assistant Secretary of the Interior recommended that S.3035 be enacted in lieu of S.3098. He also recommended, however, the adoption of some of the provisions of S.3098, including Section 202, suggesting that the section be expanded to include All structures of historic significance that are included on the national register, not simply structures of national significance.[25]
 
 
 35
 After brief hearings on the bills,[26] the Senate Committee on Interior and Insular Affairs reported out S.3035 with amendments. Section 106 of the reported bill repeated the language "prior to the approval of the expenditure of any Federal funds on the project," expanded the protection to all historic properties, required the federal agency to report any effect on a listed property to the Advisory Council on Historic Preservation, and provided for a sixty-day waiting period, beginning at the time the report is made to the Advisory Council, "before Federal funds may be expended for the project concerned."[27] The Committee Report explained that Section 106 "is intended to insure that the Federal agencies will not work at cross purposes with the goals of historic preservation and provides for a meaningful review of Federal or federally assisted projects which affect historic properties identified on a national register." S.Rep.No.1363, 89th Cong., 2d Sess. 8 (1966).[28] With little general discussion and no discussion of § 106, the Senate passed the bill on July 11, See 112 Cong.Rec. 15165-69 (1966), and referred it to the House Committee on Interior and Insular Affairs.
 
 
 36
 When the House Committee held hearings on July 15, the administration strongly objected to the waiting period requirement that the Senate Committee had added to the bill, reasoning: "A 60-day waiting period in these circumstances could seriously interfere with the execution of important Federal programs." Letter from Wilfred H. Rommel, Assistant Director for Legislative Reference, Bureau of the Budget, to Hon. Wayne N. Aspinall, Chairman, House Committee on Interior and Insular Affairs (July 15, 1966), Reprinted in 1966 U.S.Code Cong. & Admin.News, p. 3316. The House Committee accepted the administration's suggestion that the Advisory Council simply be afforded a "reasonable opportunity to comment" with regard to the project, changed the word "project" to "undertaking,"[29] and expanded the protection of § 106 to federal licensing agencies. The section, as reported by the House Committee, is identical to § 106 of NHPA as enacted.
 
 
 37
 The House Committee Report contains some language that buttresses the strict cut-off interpretation of § 106. One of the responsibilities of the Advisory Council, the Report stated, was "reviewing Plans for Federal undertakings and the undertakings of others," H.R.Rep.No.1916, Supra, 1966 U.S.Code Cong. & Admin.News, p. 3308 (emphasis added). The Report further explained that the bill "requires . . . agencies (whose undertakings affect listed properties) to afford the Advisory Council an ample, fair, and reasonable opportunity to comment with regard to such Proposed undertakings Before they are commenced." Id., 1966 U.S.Code Cong. & Admin.News, p. 3310 (emphasis added). But although this "proposal" language demonstrates a congressional commitment to delaying the initial federal funding of a program until the effect on listed properties has been assessed, it hardly demonstrates a converse commitment to rushing forward with the program once initial funding has been approved. Perhaps the legislative materials refer to "proposed" undertakings on the implicit assumption that a federal agency only has discretionary authority over the funding of a project once, at its inception. But sometimes, as here, the assumption is false.
 
 
 38
 The Committee also recognized that the bill represented a balance of goals, "an effort to establish the most effective preservation program possible at this time which is consistent with . . . the necessity for progress in our communities." Id., 1966 U.S.Code Cong. & Admin.News, p. 3309. On a more sensitive analysis, the legislative history reveals a determination to protect historic properties at every stage where the federal agency approves funding.
 
 
 39
 The House considered the bill on September 19 and October 10 and passed it by voice vote on the latter date. The Senate agreed to the House amendments on the following day without discussion, and the President signed the bill into law on October 15, 1966. Apparently the only floor debate in which § 106 was even mentioned occurred on October 10. Representative John Young, repeating the House Report's phrase, noted that the Advisory Council had the responsibility of "reviewing plans for Federal undertakings . . . ." 112 Cong.Rec. 25938 (1966). Representative Leo O'Brien, after explaining that the first purpose of the bill was to provide federal funds for local preservation, stated: "Second, the program would be reinforced by providing that no Federal agency may make money available under other Federal programs, such as urban renewal, which will affect a historically significant structure until account has been taken of these effects and until opportunity has been given to the Advisory Council . . . to comment on the plan." 112 Cong.Rec. 25940 (1966). WURA contends that O'Brien's comment suggests that the accounting and notice requirements do not apply when "the federal money has already been appropriated." But we find the comment more ambiguous; indeed, the omission of any reference to "approval" and the emphasis on expenditures militate somewhat in favor of the view that the accounting and notice requirements do apply to each approval of funding in a continuing program.
 
 
 40
 Thus the direct legislative history of § 106 is inconclusive. Apparently Congress never explicitly considered the specific issue before us, whether "approval" and "undertaking" in § 106 should be interpreted as imposing that section's accounting and notice requirements on funding approvals that occur after an initial approval of funding for a continuing program.
 
 
 41
 WURA argues that the elimination of the sixty-day waiting period requirement indicates a congressional policy against delay once the agency has reviewed, and the Advisory Council has had the chance to review, the undertaking prior to the initial funding approval. But the actual policy might be more narrow to forbid a fixed and substantial period of delay. Although our interpretation of § 106 does require more frequent agency reviews,[30] the reviews need not cause delay in the project if the agency acts with foresight.
 
 
 42
 We conclude that although Congress did not consider the narrow issue before us in 1966, it did intend in § 106 to provide "a meaningful review" of federally assisted projects which affect historic properties, S.Rep.No.1363, Supra. We believe that our interpretation of § 106 provides a far more meaningful review than the strict cut-off interpretation.
 
 
 43
 It is not without significance that the Advisory Committee itself came to interpret the Act as applying on a stage-by-stage basis. Note 9 Supra. Generally speaking, an agency's own interpretation of an act that it is charged with executing is entitled to some weight, provided that the interpretation does not directly conflict with the intent of Congress.[31] An administrative construction is particularly persuasive if Congress considers but fails to change it.[32] It is therefore interesting to review the legislative history of the 1976 amendments, Act of Sept. 28, 1976, Pub.L.No.94-422, Title II, 90 Stat. 1320, for the history suggests both that Congress might have specifically considered the Advisory Council procedures just noted and that it generally approved of a broad interpretation of NHPA § 106.
 
 
 44
 The 1976 amendments greatly increased the federal funding of historic preservation, gave the Advisory Council on Historic Preservation independent agency status, and somewhat incidentally extended the protection of § 106 to eligible as well as listed properties. It may be significant that the Senate Report treated this extension as simply a "housekeeping" amendment, and hence of not overwhelming substantive importance. S.Rep.No.94-367, 94th Cong., 2d Sess., Reprinted in 1976 U.S.Code Cong. & Admin.News, pp. 2442, 2450. Such a characterization is consistent with our interpretation of § 106. For if "approval" of expenditures may occur in the several stages of a project, it is somewhat less important whether a property is included or eligible. Even if the property must be included on the Register before § 106 applies, a phase-by-phase interpretation ensures that the impact on many eligible properties will be considered once they are listed.
 
 
 45
 Appended to the Senate Report were two reports of the Advisory Council on Historic Preservation. The first noted the importance of adequate funding for inventory and explained that "(w)hen resources are not identified until late in project planning, or when there are insufficient funds to develop a feasible and prudent preservation plan, then historic resources are lost to so-called progress." Advisory Council Report on S.327, Supra note 5, 1976 U.S.Code Cong. & Admin.News, pp. 2454, 2455.[33]
 
 
 46
 The second Advisory Council report indicated that since 1966 the National Environmental Policy Act of 1969 and Executive Order 11593 had "expanded the Council's review responsibilities, conducted pursuant to the Council's procedures (36 C.F.R. 800), to include properties that are eligible for inclusion in the National Register" and therefore pointed out that amendment of Section 106 to protect eligible properties "would clarify and support the Council's present project review activities." Advisory Council Report on NHPA, Supra note 1, 1976 U.S.Code Cong. & Admin.News, pp. 2458, 2461.[34] The Senate Report's appending of these Advisory Council reports suggests that Congress was aware of the Council's regulations but chose not to change them.
 
 
 47
 The sum and substance of all this is, we think, a congressional purpose, expanding over the years, to make certain that federal agencies give weight to the impact of their activities on historic preservation. Throughout Congress has recognized that it is necessary to identify the properties that are of state, community, or local significance, and this was one of the major purposes of the 1966 Act itself. The problems of identification were and remain considerable, as the 1976 legislative history recognizes. One would suppose that Congress, having these problems in mind, did not intend to adopt a strict cut-off date, at least as to grant and loan contracts such as this one where the federal agency gives its final approval to the expenditure of federal funds only in stages. And § 108(B) of the contract explains that one of the purposes of phased approval is to ensure that the local agency does not take any step which, in HUD's opinion, might violate federal law.
 
 
 48
 Such an interpretation of NHPA is entirely consistent with the regulations of the Advisory Council, the agency charged by NHPA to act; with Executive Order 11593; and with NEPA. The regulations we have already described. The Executive Order, promulgated in 1971, directed federal agencies, in consultation with the Advisory Council, to "institute procedures to assure that Federal plans and programs contribute to the preservation and enhancement of non-federally owned sites, structures and objects of historical, architectural or archaeological significance." 36 Fed.Reg. 8921 (May 15, 1971), 1971 U.S.Code Cong. & Admin.News, p. 2545. And NEPA, as we have pointed out, Supra note 12, explicitly includes historic preservation as an environmental objective and imposes a continuing responsibility of compliance.
 
 
 49
 We are not persuaded by the cases, Supra note 8, which have interpreted Section 106 of NHPA as imposing a "cut-off." None of the cases carefully considered the distinction between initial approval and additional approvals in an ongoing undertaking. Nor is there any indication that either Congress or the Advisory Council believes that these cases supply a binding interpretation. Certainly the Advisory Council regulations, Supra note 9, do not so indicate. And there is no reference in the legislative history of the 1976 amendments to the decided cases in the lower federal courts, Supra note 8. Thus it would be very difficult to argue that Congress by silence adopted any judicial interpretation of the cut-off rule.[35]
 
 
 50
 Moreover, the mandate of NHPA as enacted in 1966 is quite broad, 16 U.S.C. § 470. We are no more willing to give a "crabbed interpretation" to Section 106 of the Act than the courts have been in respect to NEPA. Calvert Cliffs' Coordinating Committee v. United States Atomic Energy Commission, 146 U.S.App.D.C. 33, 41, 449 F.2d 1109, 1117 (1971); See Chelsea Neighborhood Associations v. United States Postal Service, 516 F.2d 378, 385 (2d Cir. 1975); Hanly v. Mitchell, 460 F.2d 640, 647 (2d Cir.) (Hanly I ), Cert. denied, 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972); Greene County Planning Board v. Federal Power Commission, 455 F.2d 412, 419-20 (2d Cir.), Cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972); See also Penn Central Transportation Co. v. New York City, 438 U.S. 104, 131, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (recognizing that the promotion of the general public welfare by historic preservation in the form of landmarks regulation is a legitimate exercise of the state police power and holding that such regulation is not necessarily an unlawful taking requiring the award of compensation); United States v. Gettysburg Electric Railway, 160 U.S. 668, 682-83, 16 S.Ct. 427, 40 L.Ed. 576 (1896). We conclude that Section 106 as amended applies to require HUD and Advisory Council review as long as HUD retains the authority to make funding approvals pursuant to the grant and loan contract.
 
 
 51
 Here, there is no question that HUD had not approved all stages of the funding in 1976, when the amendment to § 106 requiring consideration of Eligible properties became effective, or in 1978, when the Keeper of the National Register determined that the H. H. Peck carriage house was eligible. Nor is there any question that HUD did not comply with § 106 if it was applicable, for even after the "freeze," HUD did not consider the effect of the project on the carriage house and did not solicit the Advisory Council's advice. We therefore hold that HUD's conduct violated § 106 of NHPA.
 
 B. NEPA
 
 52
 Our views with respect to NEPA accord with those of Judge Clarie,[36] which we need not repeat at length here. We think that his decision accords with how the other federal courts have interpreted NEPA. Hart v. Denver Urban Renewal Authority, 551 F.2d 1178 (10th Cir. 1977); Jones v. Lynn, 477 F.2d 885, 888-90 (1st Cir. 1973); Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323, 1330-32 (4th Cir.), Cert. denied, 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1972); Committee to Save the South Green v. Hills, No. H-76-328 (D.Conn. Nov. 5, 1976), 7 Envt'l L.Rep. 20061; Save the Courthouse Committee v. Lynn, 408 F.Supp. 1323, 1340 (S.D.N.Y.1975); Boston Waterfront Residents Association v. Romney, 343 F.Supp. 89 (D.Mass.1972). Our own cases very clearly make NEPA applicable to the quality of life in the urban setting. City of Rochester v. United States Postal Service, supra, 541 F.2d at 973; Chelsea Neighborhood Associations v. United States Postal Service, supra; Hanly v. Mitchell, supra, 460 F.2d at 647.
 
 C. Other Questions
 
 53
 Under our construction of NHPA, the other arguments of the parties are essentially mooted. WATCH's arguments pertaining to HUD regulations and Advisory Council procedures are gratuitous. The premise of WURA's arguments relative to NEPA, Viz., that NHPA is inapplicable, is false; thus its arguments based on the supposed conflict must fail.
 
 
 54
 Judgment affirmed. In accordance with the stipulation of the parties, we direct that the injunction be made permanent and that defendants be enjoined from the demolition of buildings scheduled therefor until defendants have complied with the requirements of NHPA and NEPA.
 
 LUMBARD, Circuit Judge (concurring):
 
 55
 I concur in making permanent the injunction granted by Chief Judge Clarie for the reasons stated in his succinct and thorough opinion. As HUD's failure to file an environmental impact statement violated NEPA, I see no reason to consider the contentions of the parties with respect to NHPA.
 
 
 
 *
 Of the Southern District of New York, sitting by designation
 
 
 [1]
 The HUD Handbook of Departmental Policies, Responsibilities and Procedures for Protection and Enhancement of Environmental Quality 1390.1, 38 Fed.Reg. 19182, 19185 (1973), provides:
 Any HUD action or undertaking which has an effect on a property listed on, or nominated to, the National Register of Historic Places will require Special Environmental Clearance and must comply with section 106 of the National Historic Preservation Act of 1966 and implementing procedures.
 As Judge Blumenfeld held in Committee to Save the South Green v. Hills, No. H-76-328 (D.Conn. Nov. 5, 1976), 7 Envt'l L.Rep. 20061, 20064, "implementing procedures" must refer to regulations promulgated by the Advisory Council on Historic Preservation under NHPA. After the phrase "implementing procedures," the HUD Handbook states "(see Appendix L)," and the Handbook further explains, 38 Fed.Reg. 19182 n.4 (1973), that Appendix L is the Advisory Council's Procedures for Compliance with NHPA § 106, published at 37 Fed.Reg. 24146 (1972).
 These original Advisory Council regulations required consideration of the effect of an undertaking only on Listed properties. But new regulations published on February 28, 1973, required consideration of "nominated" properties as well. Despite the reference in the HUD Handbook to Appendix L, which itself refers to the original guidelines, the Handbook probably intended to incorporate the revised 1973 guidelines, because the Handbook itself mentions "nominated" properties and postdates the 1973 guidelines.
 As if this were not complicated enough, the Advisory Council revised its procedures yet again on January 25, 1974, to apply to "eligible" properties, 39 Fed.Reg. 3366. The procedures, which have not been revised again, are codified at 36 C.F.R. § 800. Although HUD proposed to incorporate the thus-revised procedures, 39 Fed.Reg. 6816, 6819, § 50.11g (Feb. 22, 1974), it apparently has not done so. It has, however, again proposed to adopt present Advisory Council procedures to "clarify" HUD's review requirements, 43 Fed.Reg. 35170, 35173 (1978).
 It is important to note that Handbook 1390.1 originally incorporated the Advisory Council procedures pursuant not only to NHPA but also to NEPA and Executive Order 11593, 36 Fed.Reg. 8921 (1971), 1971 U.S.Code Cong. & Admin.News, p. 2545, giving the Handbook somewhat broader authority than the district judge may have attributed to it. The legislative history of the 1976 NHPA amendments elucidates this point:
 With respect to the substantive work of the Council, Section 106 requires Federal agencies to provide the Council with a reasonable opportunity to comment on their undertakings that affect properties listed on the National Register of Historic Places. Since 1966, the National Environmental Policy Act of 1969 and Executive Order 11593 of 1971 have expanded the Council's review responsibilities, conducted pursuant to the Council's procedures (36 C.F.R. 800), to include properties that are eligible for inclusion in the National Register. Recognition of these existing responsibilities, by amendment of Section 106 to include "properties eligible for inclusion in the National Register," would clarify and support the Council's present project review activities.
 The Status of the Advisory Council on Historic Preservation under the National Historic Preservation Act of 1966: Report of the Advisory Council on Historic Preservation to the Senate Committee on Interior and Insular Affairs, June 1975, in S.Rep.No.94-367, 94th Cong., 2d Sess. 33, 1976 U.S.Code Cong. & Admin.News, pp. 2442, 2460-61.
 
 
 [2]
 As we understand it, the stipulation removes all such questions from the case. We note, however, that the district judge was surely correct in finding irreparable injury; demolition is generally irreparable
 
 
 [3]
 The district court noted that there is some slight dispute about these figures but that the dispute is irrelevant to the merits. WATCH v. Harris, No. H-78-539 (D.Conn. Dec. 22, 1978), at 4 n.1
 
 
 [4]
 Section 108 of the Contract provides in full:
 (A) Types of Project Data to Be Furnished. The Local Public Agency will promptly furnish the Secretary with such copies as he may reasonably require, for his use under this Contract, of the following items covering actions then proposed to be taken by the Local Public Agency in its carrying out of, and which pertain to, the Project:
 (1) Documentary data covering salary rate determinations made under State or local law with respect to architects, technical engineers, draftsmen, and technicians to be employed in the development of the Project;
 (2) Contract documents covering contracts of each type it proposes to enter into or upon which it proposes to seek bids or proposals;
 (3) Tabulations of bids or proposals it receives on contracts for which it seeks bids or proposals;
 (4) Documentary data covering its proposed awards of contracts;
 (5) Contract change orders and contract novations which it proposes to issue, and proposed contract assignments which it proposes to approve;
 (6) Documentary data covering its proposed determinations respecting liquidated damages and extensions of time under its awarded contracts;
 (7) Documentary data covering any Project work it proposes to undertake by so-called "force account";
 (8) Reports of appraisals which are made at its instance with respect to land in the Urban Renewal Area to be acquired by it as a part of the Project, and similar reports with respect to Project Land to be disposed of by it;
 (9) Documentary data covering its proposed acquisitions of options to acquire land in the Urban Renewal Area as a part of the Project except where the option is for a nominal consideration and the land purchase price stated in the proposed option does not exceed the purchase price of such land, as theretofore concurred in by the Secretary;
 (10) Documentary data covering its proposed granting of options to others to acquire Project Land;
 (11) Proposed contract documents by which it proposes to contract to acquire land in the Urban Renewal Area as a part of the Project or proposes to contract to dispose of Project Land;
 (12) Documentary data covering its proposed acquisitions of land in the Urban Renewal Area as a part of the Project and covering its proposed dispositions and retentions of Project Land;
 (13) Documentary data covering its proposed determinations of fair value of Project Land to be disposed of by it;
 (14) Documentary data supporting the capital values it proposes to impute to Project Land to be leased by it to others or to be retained by it for use in accordance with the Urban Renewal Plan;
 (15) Documentary data covering its proposed arrangements respecting its temporary operation, utilization, or disposition of Project Land pending its preparation and ultimate sale, lease, or retention of Project Land for uses in accordance with the Urban Renewal Plan;
 (16) Documentary data covering its proposed clearance of buildings and structures from the Urban Renewal Area and covering its proposed utilization or disposition of such buildings and structures;
 (17) Documentary data covering any proposed changes in the Project, the Urban Renewal Area, the Urban Renewal Plan, or the Relocation Plans;
 (18) The proceedings which, from time to time, it proposes to take for the authorization, execution, issuance, and delivery of any Project Temporary Loan Obligations, Preliminary Loan Obligations, Project Definitive Loan Obligations, or Project Loan Payment Obligations; and
 (19) Other documentary data, not hereinbefore mentioned in this subsection, covering any proposed actions of the Local Public Agency pertaining to the Project.
 (B) Advice by Secretary to Local Public Agency Concerning Certain Proposed Actions by Latter. Notwithstanding any other provisions of this Contract, the Government may elect not to make a requested payment on account of the Project Temporary Loan, any Project Definitive Loan, or the Project Capital Grant if, after the Local Public Agency shall have furnished any item covered by and in accordance with Section 108(A) hereof, the Local Public Agency shall have proceeded further with respect thereto without having been advised in writing by the Secretary to the effect that the Government has no objection to the Local Public Agency so proceeding (it being the purpose of this subsection, and of Section 108(A) hereof, to insure that the Local Public Agency shall not take any step which might, in the opinion of the Secretary, violate applicable Federal laws or regulations or provisions of this Contract, and to minimize thereby the possibility of violations which might render it impossible for the Government to make the Project Temporary Loan or any Project Definitive Loan or to pay the Project Capital Grant, as the case may be, or which might result in unnecessary and ineligible costs or unnecessary delays with respect to the Project).
 
 
 [5]
 This is not surprising. As indicated in the legislative history of the 1976 Amendments to NHPA,
 One result of the current funding situation is that the backlog of work to be done in identifying and preserving properties will continue to increase. If the program is left unchanged, in a few years such massive funding may be required to eliminate the backlog that it may not be possible to reach a state of parity with the needs. This would be a crucial problem because the current preservation movement has shifted from the preservation of nationally significant sites pursuant to the Historic Sites Act of 1935 and the preservation of individual sites of State or local importance under the 1966 Act to the conservation of basic elements of the human environment. This is particularly true in urban areas. Entire neighborhoods are now (1975) The focus for preservation, although they would not have met the older tests of outstanding historical or architectural merit. Areas of cultural significance, such as Chinatown in Honolulu, or Beale Street in Memphis, benefit from the present Federal preservation programs. In this manner, Preservation becomes more relevant to a broader segment of American society and local enthusiasm for the program continues to increase. Federal participation should keep pace with this expanding base of support.
 Title II of S.327: A Report of the Advisory Council on Historic Preservation to the Senate Committee on Interior and Insular Affairs, June, 1975, in S.Rep.No.94-367, 94th Cong., 2d Sess. 28, 1976 U.S.Code Cong. & Admin.News, p. 2456 (emphasis supplied).
 
 
 [6]
 The State's belated consideration of the carriage house is also not surprising, for interest in local historic preservation has become widespread only in recent years, and state historic preservation offices have been underfunded and understaffed. See S.Rep.No.94-367, Supra note 1, at 6-7, 1976 U.S.Code Cong. & Admin.News, at 2444-45; and Advisory Council Report, Supra note 5, in S.Rep.No.367, Supra note 1, at 27, 1976 U.S.Code Cong. & Admin.News, at 2455-56 ("The National Register only lists about 10,000 properties at this time (1975) out of an estimated total in excess of 50,000 when the Register is complete. The major cause of this lag is lack of funds. . . . Given limited funds, the States have had to use most of their monies for 'bricks and mortar' preservation of already inventoried properties in imminent danger of loss.")
 
 
 [7]
 Prior to 1976, § 106 provided in full:
 The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal Department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation established under sections 470i to 470n of this title a reasonable opportunity to comment with regard to such undertaking.
 16 U.S.C. § 470f (1970).
 
 
 [8]
 The principal cases are South Hill Neighborhood Ass'n v. Romney, 421 F.2d 454, 462 (6th Cir. 1969), Cert. denied, 397 U.S. 1025, 90 S.Ct. 1261, 25 L.Ed.2d 534 (1970); and Kent County Council for Historic Preservation v. Romney, 304 F.Supp. 885, 888 (W.D.Mich.1969). Subsequent cases invoking what may be called the "cut-off" principle have simply followed these cases. Hart v. Denver Urban Renewal Auth., 551 F.2d 1178, 1180 (10th Cir. 1977); Committee to Save the South Green v. Hills, supra, 7 Envt'l L.Rep. at 20064; Save the Courthouse Comm. v. Lynn, 408 F.Supp. 1323, 1335-36 (S.D.N.Y.1975); St. Joseph Historical Soc. v. Land Clearance for Redevelopment Auth., 366 F.Supp. 605, 608-09 (W.D.Mo.1973)
 Kent County appears to be the source of the "cut-off" principle. Responding to plaintiff's contention that each expenditure of federal funds invokes the protections of § 106, the judge noted that "prior to the expenditure" and "prior to approval of the expenditure" (the statutory language) reflect "two separate and distinct concepts." 304 F.Supp. at 888. The judge then used the rather strong language: "This Court would have to be mad to place such a ludicrous interpretation on the simple clear language employed by Congress in § 470f." Id. We suggest, however, that although each new Expenditure of federal funds does not bring § 106 into play, each new Approval of a phase of a plan might, if (as here) HUD's approval is necessary before federal funds may be expended on that portion of the plan. None of the other cases discusses, let alone makes, this distinction; evidently none of the parties argued the specific point. (Some of the cases have conceded, however, that if an Amendment to the general urban renewal plan increases the commitment of federal funds, a new "approval" has occurred within the meaning of § 106. Hart v. Denver Urban Renewal Auth., supra; South Hill Neighborhood Ass'n, supra; Save the Courthouse Comm., supra.
 
 
 [9]
 36 C.F.R. § 800.3 provides:
 As used in these procedures:
 (c) "Undertaking" means any Federal action, activity, or program, or the approval, sanction, assistance, or support of any other action, activity or program, including but not limited to:
 (2) New and continuing projects and program activities: directly undertaken by Federal agencies; or supported in whole or in part through Federal contracts, grants, subsidies, loans, or other forms of funding assistance; or involving a Federal lease, permit, license, certificate, or other entitlement for use.
 (g) "Decision" means the exercise of agency authority at any stage of an undertaking where alterations might be made in the undertaking to modify its impact upon historic and cultural properties.
 The importance of this last definition is apparent from 36 C.F.R. § 800.4(a):
 Identification of resources. As early as possible and in all cases prior to agency decision concerning an undertaking, the Agency Official shall identify properties located within the area of the undertaking's potential environmental impact that are included in or eligible for inclusion in the National Register.
 
 
 [10]
 42 U.S.C. § 4332(2) provides in pertinent part:
 (2) all agencies of the Federal Government shall
 (C) include in every recommendation or report on proposals for legislation or other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on
 (i) the environmental impact of the proposed action,
 (iii) alternatives to the proposed action,
 Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. . . .
 
 
 [11]
 Jones v. Lynn, 477 F.2d 885, 889 (1st Cir. 1973); Monroe County Conservation Council v. Volpe, 472 F.2d 693, 699 (2d Cir. 1972); Save the Courthouse Comm., supra, 408 F.Supp. at 1340
 
 
 [12]
 Section 101(b) of NEPA, 42 U.S.C. § 4331(b), provides in part:
 In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may
 (4) preserve important historic, cultural, and natural aspects of our national heritage . . . .
 
 
 [13]
 A mechanical difficulty with this argument is that HUD had not adopted the "eligibility" provisions of the Advisory Council Procedures in its Handbook 1390.1 as of the time this case was heard below, perhaps through oversight or because HUD considered adoption unnecessary in light of the 1976 amendments to NHPA
 
 
 [14]
 Ordinarily, of course, we will not consider arguments not made in the court below. Terkildsen v. Waters, 481 F.2d 201, 204-05 (2d Cir. 1973)
 
 
 [15]
 E. g., Environmental Defense Fund, Inc. v. EPA, 160 U.S.App.D.C. 123, 133, 489 F.2d 1247, 1257 (1973); Portland Cement Ass'n v. Ruckelshaus, 158 U.S.App.D.C. 308, 317, 486 F.2d 375, 384 (1973), Cert. denied, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974); International Harvester Co. v. Ruckelshaus, 155 U.S.App.D.C. 411, 446, n.130, 478 F.2d 615, 650 n.130 (1973)
 
 
 [16]
 Under the Interstate Land Sales Full Disclosure Act, a real estate developer is required to file a disclosure statement with HUD, and HUD must permit the statement to become effective unless it disapproves of it within 30 days. 15 U.S.C. §§ 1704, 1706(a). HUD could not possibly comply with the latter requirement if it also had to file a NEPA environmental impact statement before allowing the statement to go into effect. Therefore, the Court held, because there was a "clear and unavoidable conflict . . ., NEPA must give way." Flint Ridge Dev. Co. v. Scenic Rivers Ass'n, 426 U.S. 776, 788, 96 S.Ct. 2430, 2438, 49 L.Ed.2d 205 (1976). See also United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 694, 93 S.Ct. 2405, 2418, 37 L.Ed.2d 254 (1973) ("NEPA was not intended to repeal by implication any other statute")
 
 
 [17]
 See note 12 Supra
 
 
 [18]
 The Government reasons that the "functional equivalence" doctrine has been applied only to EPA activities under pollution control laws where the agency's objective was to explore environmental factors that included those enumerated in NEPA; that NHPA is not a "functional equivalent" of NEPA; and that even if it were, the doctrine cannot be invoked here because NHPA's provisions do not apply and thus do not offer any "protection," equivalent or otherwise
 
 
 [19]
 One indication that Congress understands the distinction between approving an undertaking and approving expenditures on an undertaking is that Congress clearly provided for the former type of approval in the Department of Transportation Act of 1966:
 (T)he Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use.
 49 U.S.C. § 1653(f).
 
 
 [20]
 See 36 C.F.R. § 800.3(c)(2)
 
 
 [21]
 See Guiseppi v. Walling, 144 F.2d 608, 623, 624 (2d Cir. 1944) (L. Hand, J., concurring), Aff'd sub nom. Gemsco, Inc. v. Walling, 324 U.S. 244, 65 S.Ct. 605, 89 L.Ed. 921 (1945); Cox, Judge Learned Hand and the Interpretation of Statutes, 60 Harv.L.Rev. 370, 382-84 (1947). See also Schwegmann Brothers v. Calvert Distillers Corp., 341 U.S. 384, 395, 74 S.Ct. 745, 95 L.Ed. 1035 (1951) (Jackson, J., concurring)
 
 
 [22]
 L. Hand, The Speech of Justice, 29 Harv.L.Rev. 617, 620 (1916)
 
 
 [23]
 The Antiquities Act of 1906 was a direct outgrowth of President Theodore Roosevelt's concern with and appreciation of the preservation of America's national heritage. W. Harbaugh, Power and Responsibility: The Life and Times of Theodore Roosevelt 331 (1961)
 
 
 [24]
 This policy carries over to the present. Title IV of the Housing and Urban Development Act of 1970, Pub.L.No. 91-609, 84 Stat. 1781 (1970) (amending Inter alia 42 U.S.C. § 1500 et seq.), provides for grants to preserve historic sites. Grants for historic preservation are also provided in Title I of the Housing and Community Development Act of 1974, 42 U.S.C. § 5301 et seq. We also note that the Internal Revenue Code provides some tax incentives for historic preservation. I.R.C. §§ 167(n) & (o), 191, 280B
 
 
 [25]
 See 1966 U.S.Code Cong. & Admin.News, pp. 3318-19, reproducing the virtually identical June 10, 1966, letter from the Deputy Assistant Secretary of the Interior to the Chairman of the House Committee on Interior and Insular Affairs concerning the House versions of S.3035 and S.3098
 
 
 [26]
 During hearings on the two bills before the Senate Committee on Interior and Insular Affairs on June 8, 1966, Gordon Gray, Chairman of the National Trust for Historic Preservation, expressed his concern that national monuments be protected against demolition, mutilation or alteration without the approval of the proposed advisory board. When Gray was informed that Section 202 of S.3098 responded to this concern, Gray perused the section and agreed, stating: "I think it meets my problem, Mr. Chairman, of making sure that Federal agencies do not destroy historic properties in their Ongoing activities." Preservation of Historic Properties: Hearing on S.3035 and S.3098 before the Subcomm. on Parks and Recreation of the Senate Comm. on Interior and Insular Affairs, 89th Cong., 2d Sess. 24 (1966) (emphasis added)
 
 
 [27]
 Section 106 of the bill as reported provided in full:
 The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted project in any State shall, prior to the approval of the expenditure of any Federal funds on the project, take into account the effect of the project on any district, site, building, structure, or object that is included in the National Register, and, if any such historical properties are affected, report such effect to the National Advisory Council on Historic Preservation established under title II of this Act for its consideration. There shall be a sixty-day waiting period, beginning on the date a report is made to the National Advisory Council on Historic Preservation, before Federal funds may be expended for the project concerned.
 
 
 [28]
 See also S.Rep.No.1363, 89th Cong., 2d Sess. 10 (1966) (§ 106 requires federal agencies to report projects with affect historic properties to the Advisory Council "before Authorizing the expenditure of Federal funds on the project" (emphasis added))
 
 
 [29]
 The use of the term "undertaking" rather than "project" might suggest that § 106 applies to continuing activities. But we should not place too much emphasis on the unexplained change of one word in a statute; indeed, the change might simply suggest that § 106 applies to federal activities of any scope or kind
 
 
 [30]
 We recognize that insofar as our interpretation of § 106 requires agency review and notice to the Advisory Council whenever the agency approves the funding of any stage of a project, a project with many funding stages will require periodic reviews. But we do not believe that this "construction of the statute would place too great a burden on the urban renewal administrative process," South Hill Neighborhood Ass'n, supra, 421 F.2d at 462. Surely the courts would respect reasonable agency procedures for updating past reviews. Similar requirements under NEPA have not proved unworkable
 
 
 [31]
 Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969) ("the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong, especially when Congress has refused to alter the administrative construction" (footnotes omitted)), Udall v. Tallman, 380 U.S. 1, 16-18, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); CAB v. Carefree Travel, Inc., 513 F.2d 375, 390 (2d Cir. 1975). See also ITT World Communications, Inc. v. FCC, 595 F.2d 897 (2d Cir. 1979), slip op. 1861, 1884, Citing Power Reactor Co. v. Electricians, 367 U.S. 396, 408, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961), and Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933) (administrative practice "has peculiar weight when it involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new.")
 Concededly the Advisory Council procedures published at 36 C.F.R. § 800 are based on the authority of Executive Order 11593 and NEPA as well as NHPA. The administrative construction is nevertheless entitled to some weight in interpreting NHPA, for the Advisory Council's elaboration of "undertaking," "effect," and other terms of NHPA § 106 reveals an intent to define the scope of that statute's protections. Moreover, even the Council's 1972 procedures, adopted on the sole authority of NHPA, define "undertaking" broadly. 37 Fed.Reg. 24146 (1972).
 HUD, of course, is also charged with administering NHPA, for it is the federal agency with jurisdiction over this urban renewal project under § 106. Although HUD has not officially adopted the Advisory Council procedures in 36 C.F.R. § 800, it has proposed to do so. Thus HUD's inaction in no way contradicts the Council's interpretation of the statute.
 
 
 [32]
 See Udall v. Tallman, supra, 380 U.S. at 17-18, 85 S.Ct. 792
 
 
 [33]
 The 1846 railroad terminal in Salem, Massachusetts, one of the first such stations in the country, was, the Advisory Council's report noted, "demolished before its significance was recognized." Advisory Council Report on S.327, Supra note 5, 1976 U.S.Code Cong. & Admin.News, p. 2455
 
 
 [34]
 The House Conference Report accepted the Senate five-year funding authorization and, without discussion, recommended approval of the Senate provisions recognizing the Advisory Council as an independent agency and making "all of the necessary changes in the National Historic Preservation Act of 1966 to accomplish this purpose . . . ." H.Conf.Rep.No.94-1468, 94th Cong., 2d Sess. 19, 1976 U.S.Code Cong. & Admin.News, pp. 2462, 2466. The Report contains no other more direct reference to the amendment to § 106
 
 
 [35]
 See Boys Markets, Inc. v. Retail Clerks, Local 770, 398 U.S. 235, 241-42, 90 S.Ct. 1583, 1587, 26 L.Ed.2d 199 (1970) (absent "persuasive circumstances evidencing a clear design" that congressional inaction amounts to acceptance of a judicial rule, the mere silence of Congress is not a sufficient reason for refusing to reconsider the rule)
 
 
 [36]
 We do note, however, that the district court slightly overstated the procedural obligations established by Hanly v. Kleindienst, 471 F.2d 823 (2d Cir. 1972) (Hanly II ), Cert. denied, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973). Hanly II did not, as the court suggested, require a federal agency to conduct a public hearing before making its threshold determination as to whether an environmental impact statement was required. But although we did not require "a full-fledged formal hearing" in every case, we did hold that the agency "must give notice to the public of the proposed major federal action and an opportunity to submit relevant facts which might bear upon the agency's threshold decision." Id. at 836