**MORRIS COUNTY TRUST FOR HISTORIC PRESERVATION, Morris County Historical Society, and Robert Thompson**

v.

**PIERCE, Samuel R., in His Capacity as Secretary of the United States Department of Housing and Urban Development; Town of Dover Redevelopment Agency, a body corporate and politic of the State of New Jersey; and Frank Dill, in His Capacity as Building Inspector of the Town of Dover.**

**Appeal of Samuel R. PIERCE, Secretary of Housing and Urban Development.**

No. 82–5656.

United States Court of Appeals,
Third Circuit.

Argued on June 7, 1983.

Decided July 29, 1983.

Rehearing and Rehearing En Banc Denied Oct. 3, 1983.

---

Carol E. Dinkins, Asst. Atty. Gen., W. Hugh Dumont, U.S. Atty., Lorraine S. Gerson, Asst. U.S. Atty., Newark, N.J., Peter R. Steenland, Jr., Martin Green (argued), Attys., Dept. of Justice, Washington, D.C., for appellants.

Mark L. First (argued), Jamieson, McCardell, Moore, Peskin & Spicer, Trenton, N.J., for appellees.

Before SEITZ, Chief Judge, SLOVITER, Circuit Judge and POLLAK, District Judge.[*]

## OPINION OF THE COURT

SEITZ, Chief Judge.

Samuel R. Pierce, Secretary of the United States Department of Housing and Urban Development (hereinafter referred to as HUD), appeals an order of the district court permanently enjoining demolition of the Old Stone Academy by the Town of Dover Redevelopment Authority (TDRA) until HUD conducts a historical and cultural resource review pursuant to section 106 of the National Historic Preservation Act, 16 U.S.C. § 470 et seq. (1976 & Supp.1982), and an environmental clearance pursuant to the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. (1976). This court has jurisdiction under 28 U.S.C. § 1291 (1976).

### I.

The following facts are undisputed. In 1968, HUD approved an Urban Renewal Plan submitted by the Town of Dover, New Jersey. Among its provisions, the Plan directed that all of the buildings along Dickerson Street would be demolished. Dickerson Street would then be widened, additional parking would be provided, and a new traffic pattern would be established for easy flow and access for the remaining commercial district on Blackwell Street.

One of the buildings slated for demolition according to the plan is the Old Stone Academy. Constructed in 1829, just a few years after Dover's incorporation and first development, the Old Stone Academy was the Town's first general public building.

In 1969, HUD and the Town of Dover signed a Loan and Capital Grant Contract pursuant to Title I of the Housing Act of 1949, 42 U.S.C. § 1450 (1976). The Contract provided the funds necessary to undertake the previously approved Urban Renewal Plan, and to carry out the slum clearance and redevelopment of the area. The Loan and Capital Grant Contract was closed out on April 16, 1982, after which time TDRA continued to be funded through a short-term, direct-financing Federal loan.

Defendant TDRA is a body corporate and politic of the State of New Jersey, created by the Town of Dover and charged with implementing the Urban Renewal Plan for the Dickerson Street Urban Renewal Area Project. TDRA acquired ownership of the Stone Academy in December of 1978. On July 7, 1980, TDRA voted to execute the demolition of the building.

Following several skirmishes with TDRA in the courts of the State of New Jersey, appellees Morris County Trust for Historic Preservation, et al. (MCTHP) filed a complaint in the United States District Court for the District of New Jersey. Based on allegations that HUD failed to comply with

[*] Honorable Louis H. Pollak, United States District Judge for the Eastern District of Pennsyl- vania, sitting by designation.

the environmental and historical review requirements of NEPA and NHPA concerning the proposed demolition of the Stone Academy, MCTHP requested that the demolition of the structure be enjoined until HUD complies with its various statutory and regulatory responsibilities. The parties consented, pursuant to Fed.R.Civ.P. 65(b), to the consolidation of the trial of the action on the merits with the plaintiffs' application for a preliminary injunction. The district court, agreeing in large part with MCTHP's contentions, entered an order enjoining the demolition of the Stone Academy until such time as HUD conducts a historical and cultural resource review pursuant to NHPA and an environmental clearance pursuant to NEPA. HUD filed a timely notice of appeal.

## II. *NEPA*

Congress enacted NEPA in 1969 in order "to declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality." 42 U.S.C. § 4321.

NEPA is primarily a procedural statute, *Stryckers Bay Neighborhood Council v. Karlen,* 444 U.S. 223, 227, 100 S.Ct. 497, 499, 62 L.Ed.2d 433 (1979), designed to ensure that environmental concerns are integrated into the very process of agency decision-making. *Andrus v. Sierra Club,* 442 U.S. 347, 350, 99 S.Ct. 2335, 2337, 60 L.Ed.2d 943 (1978); *see Baltimore Gas & Electric Co. v. NRDC,* —— U.S. ——, ——, 103 S.Ct. 2246, 2251, 76 L.Ed.2d 437 (1983) (NEPA requires federal agencies to take a "hard look" at environmental consequences before taking a major action). An additional goal of NEPA is to inform the public that an agency has considered environmental concerns in its decision-making process. *Weinberger v. Catholic Action of Hawaii/Peace*

*Education Project,* 454 U.S. 139, 142–43, 102 S.Ct. 197, 201, 70 L.Ed.2d 298 (1981). To accomplish these ends, NEPA provides, *inter alia,* that

> it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—
>
> \*     \*     \*     \*     \*     \*
>
> (4) preserve important *historic,* cultural, and natural aspects of our national heritage.

42 U.S.C. § 4331(b) (emphasis added).

█ The heart and soul of NEPA is the requirement that Federal agencies, before taking action that may have a significant effect on the environment, must prepare a detailed environmental impact statement (EIS). In the terms of the statute:

> The Congress authorizes and directs that, to the fullest extent possible . . . (2) all agencies of the Federal Government shall—
>
> \*     \*     \*     \*     \*     \*
>
> (C) include in every recommendation or report on proposals for legislation and other *major Federal actions* significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
>
> (i) the environmental impact of the proposed action,
>
> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
>
> (iii) alternatives to the proposed action,
>
> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
>
> (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C) (emphasis added). Once accomplished, an environmental review under NEPA does not necessarily dic-

tate any substantive outcome: the statute is merely intended to make decision makers aware of the potential environmental ramifications of their actions. *Township of Lower Alloways Creek v. Public Service Electric,* 687 F.2d 732, 739 n. 13 (3d Cir. 1982).

In the present case, it is undisputed that HUD at no time prepared an environmental impact statement concerning the Dover Urban Renewal Project or considered whether an EIS was necessary. HUD argues that its inaction did not violate NEPA because the effective date of NEPA, January 1, 1970, succeeded the signing of the Loan and Capital Grant Contract by one year, and HUD's approval of the Urban Renewal Plan by two years.

The district court held, *inter alia,* that "NEPA [is] applicable to the ongoing Dickerson Street Urban Renewal Project because HUD has remained meaningfully involved in the Project after the date of its approval of the Urban Renewal Plan and the date of execution of the Loan and Capital Grant Contract." In the district court's view, HUD's continuing involvement in the project constituted "major federal action" within the meaning of 42 U.S.C. § 4332(2)(C), thus triggering the environmental review provisions of the Act. Our standard of review of the district court's holding is plenary.

### A. *Major Federal Action*

HUD's position is that in cases where the Federal government provides funding for an urban renewal project, major federal action occurs only when the Federal government initially approves the proposed plan or any major amendment to the plan. *See* 47 Fed.Reg. 56271 (Dec. 15, 1982) (current interim rule); 24 C.F.R. § 50.62 App. A (1982) (prior HUD regulations). HUD relies on several cases which so hold. *See e.g., San Francisco Tomorrow v. Romney,* 472 F.2d 1021, 1024–25 (9th Cir.1973); *Sworob v. Harris,* 451 F.Supp. 96, 107 (E.D.Pa.), *aff'd without opinion,* 578 F.2d 1376 (3d Cir.1978), *cert. denied,* 439 U.S. 1089, 99 S.Ct. 871, 59 L.Ed.2d 55 (1979).

By contrast, appellees suggest that the words "major federal action" also require compliance with NEPA at any stage of the implementation of a federally-assisted project where a Federal agency has authority to require alteration of building or design plans to enhance the environment. This construction of NEPA, adopted by the district court, also finds support in several cases. *See People Against Nuclear Energy v. United States Nuclear Regulatory Commission,* 678 F.2d 222, 231 (D.C.Cir.1982), *reversed on other grounds sub nom, Metropolitan Edison Co. v. People Against Nuclear Energy,* —— U.S. ——, 103 S.Ct. 1556, 75 L.Ed.2d 534 (1983); *WATCH v. Harris,* 603 F.2d 310, 318, 326 (2d Cir.), *cert. denied,* 444 U.S. 995, 100 S.Ct. 530, 62 L.Ed.2d 426 (1979); *Hart v. Denver Urban Renewal Authority,* 551 F.2d 1178, 1182 (10th Cir.1977); *Jones v. Lynn,* 477 F.2d 885, 890–91 (1st Cir.1973).

In choosing between these suggested interpretations of "major federal action", we begin by noting that NEPA neither provides a definition of major federal action, nor addresses the statute's applicability to ongoing projects approved before the effective date of NEPA. The statute does say, however, that the environmental policies underlying NEPA should be implemented "to the fullest extent possible", 42 U.S.C. § 4332, and that it is the "continuing responsibility" of the Federal government to preserve important historic, cultural, and natural aspects of our national heritage. 42 U.S.C. § 4331(b)(4). We think these statements, albeit indirectly so, support the district court's holding that NEPA should be applicable to federally-assisted projects which were initiated prior to 1970 but which remain subject to the authority of a Federal agency to review the implementation of the project on a stage by stage basis. *See Concerned Citizens of Bushkill Township v. Costle,* 592 F.2d 164, 169, 171 (3d Cir.1976) (because NEPA places "continuing" responsibility on Federal government to consider environmental effects of Federal action, Federal agencies should continue to consider the environmental effects of an

ongoing project until there has been an irretrievable commitment of resources); *cf. NAACP v. Medical Center, Inc.,* 584 F.2d 619, 634 (3d Cir.1978) (when Federal agency may act to prevent the environmental consequences of another's actions, responsibility for those consequences may be fairly considered that of the federal agency for purposes of major "federal" action under NEPA).

Appellees' interpretation of "major federal action" as including continuing Federal authority also finds support in regulations drafted by the Council on Environmental Quality. 40 C.F.R. § 1500 et seq. (1982). By virtue of Executive Order No. 11991, 3 C.F.R. 124 (1978), these regulations are binding on all federal agencies.[1] *People Against Nuclear Energy v. Nuclear Regulatory Commission,* 678 F.2d at 231 n. 13 (CEQ guidelines made binding in order to establish uniform procedures for implementing NEPA and to eliminate inconsistent agency interpretations). Consequently, the Supreme Court has held that the CEQ guidelines are entitled to substantial deference in interpreting the meaning of NEPA provisions, even when CEQ regulations are in conflict with an interpretation of NEPA adopted by one of the Federal agencies. *Andrus v. Sierra Club,* 442 U.S. at 358, 99 S.Ct. at 2341 (CEQ's interpretation given precedence over contrary interpretation of NEPA adopted by Department of Interior).

Relevant regulations promulgated by CEQ provide that major federal action within the meaning of NEPA includes "new and *continuing* activities ... with effects that may be major and which are *potentially subject to Federal control and responsibility.*" 40 C.F.R. § 1508.18(a) (1982) (emphasis added). Moreover, the guidelines also provide that "NEPA shall continue to be applicable to actions begun before January 1, 1970, *to the fullest extent possible.*" 40 C.F.R. § 1506.12 (1982) (emphasis added). In our view, these regulations provide im-

pressive support for the district court's interpretation of major federal action.

The terms of Executive Order No. 11593, 36 Fed.Reg. 8921 (1971) provide further confirmation of the district court's interpretation of "major federal action". This Order states that, "[t]he Federal Government shall provide leadership in preserving, restoring, and maintaining the historic and cultural environment of the nation. Agencies of the executive branch of the government ... shall (1) administer the cultural properties under their control in a spirit of stewardship and trusteeship for future generations..." The requirement that Federal agencies administer properties *under their control* in accordance with historic preservation goals is substantially similar to the district court's holding that an agency must comply with NEPA at any stage of an ongoing project when it may demand an alteration of the project to conform with environmental goals.

■ Finally, we note that the district court's interpretation of "major federal action" is consistent with the purpose of NEPA. By requiring Federal agencies to consider the environmental consequences of action for which they are responsible, Congress' ultimate goal was to prevent environmental damage which is not justified by a countervailing federal interest. *Cape May Greene, Inc. v. Warren,* 698 F.2d 179, 188 (3d Cir.1983) (NEPA requires balancing between environmental costs and economic and technical benefits). Surely the environmental disturbance caused by a federally-assisted project is no less significant because of the date of the planning of the project. *Jones v. Lynn,* 477 F.2d at 888.

HUD does not argue that appellees' suggested interpretation of NEPA would place undue administrative burdens on the urban renewal process. As HUD acknowledged at oral argument, the district court's interpretation of NEPA would not necessarily require a Federal agency to prepare an en-

---

1. Previously, CEQ had been authorized by Executive Order No. 11514, § 3(h), only to issue nonbinding "guidelines to Federal agencies for the preparation of detailed statements on pro-

posals for legislation and other Federal actions affecting the environment." 3 C.F.R. § 904 (1966–70 Comp.); *Andrus v. Sierra Club,* 442 U.S. at 353 n. 10, 99 S.Ct. at 2339 n. 10.

tirely new EIS at each stage of an ongoing project which presents an opportunity for the Federal agency to alter the original plan. For example, an EIS would be unnecessary in cases where a more brief "environmental assessment" [2] would suffice, or when federal action falls within a "categorical exclusion".[3]

■ Also, in cases where an EIS or an environmental assessment has already been prepared with regard to a project, a new assessment or EIS would be necessary only when newly acquired information or an environmentally significant change in the project reveals that the prior assessment or EIS is no longer adequate. *See* 47 Fed.Reg. 56273 (December 15, 1982) (HUD interim rule implementing NEPA) (environmental assessment need be reevaluated and updated only when "the basis for the original environmental finding is affected by a major change requiring HUD approval in the nature, magnitude or extent of a project and the project is not yet complete"); *Township of Springfield v. Lewis,* 702 F.2d 426, 446 & n. 38 (3d Cir.1983) (courts must allow involved agencies leeway to make a reasoned determination that new studies

and information do not require revising and recirculating an EIS). Finally, no environmental assessment or EIS need be prepared for those aspects of a project for which an irretrievable commitment of resources has already produced most of the environmental harm which an EIS would have anticipated. *Shiffler v. Schlesinger,* 548 F.2d 96, 104 (3d Cir.1977); *see Jones v. Lynn,* 477 F.2d at 889 (NEPA only requires a meaningful review of Federal action).

■ Based on our review of the statutory language of NEPA as well as its purpose and implementing regulations, we believe the district court did not err in interpreting the words "major federal action" to require compliance with NEPA at any stage of an ongoing, Federally-assisted project begun prior to 1970 at which a Federal agency has authority to alter the substance of that project. Such an application of NEPA is not retroactive, but prospective, since it seeks "to alter, within proper limits, the aspects of a proposal which have not yet been completed, and not to undo anything which has already proceeded to final [completion]" prior to the effective date of NEPA.[4] *Jones v. Lynn,* 477 F.2d at 889.

2. CEQ guidelines define an environmental assessment as follows:
"Environmental Assessment":
(a) means a concise public document for which a Federal agency is responsible that serves to:
(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.
(2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.
(3) Facilitate preparation of a statement when one is necessary.
(b) Shall include brief discussions of the need for the proposal, of alternatives as required by sec. 102(2)(E), of the environmental impacts of the proposed actions and alternatives, and a listing of agencies and persons consulted.
40 C.F.R. § 1508.9 (1982).

3. CEQ guidelines define a "categorical exclusion" as follows.
"Categorical Exclusion" means a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to

have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§ 1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required.
40 C.F.R. § 1508.4 (1982).

4. Thus, two prior cases in which this Court held that no EIS or environmental assessment was necessary because NEPA is not retroactive are distinguishable. *See Pennsylvania Environmental Council v. Bartlett,* 454 F.2d 613, 624 (3d Cir.1971) (NEPA does not apply to Federal program initiated before January 1, 1970; distinguishing NEPA cases in which discretionary federal administrative action takes place in stages, and some stages took place prior to January 1, 1970 while others remain); *Concerned Citizens of Marlboro v. Volpe,* 459 F.2d 332, 335 (3d Cir.1972). *Transcontinental Gas Pipeline Corp. v. Hackensack Meadowlands Development Commission,* 464 F.2d 1358, 1366 (3d Cir.1972), *cert. denied,* 409 U.S. 1118, 93 S.Ct. 909, 34 L.Ed.2d 701 (1973), is different from the instant case because in *Transcontinental,* there was no federal funding of the regional development commission's construction of a natural gas plant.

## B. *Continuing Authority*

■ The district court held that HUD exercised continuing authority over the Dover Urban Renewal Project after January 1, 1970 by virtue of the provisions of the Dover Loan and Capital Grant Contract. Section 108(A) of the Contract requires the local public agency, in this case TDRA, to furnish HUD promptly with documentary data concerning any proposed actions of the local agency pertaining to the project. According to Section 108(B) of the Contract, the purpose of the data submission requirement is to afford HUD the opportunity to "insure that the Local Public Agency shall not take any step which might, in the opinion of the Secretary, violate applicable Federal laws or regulations or provisions of [the] contract...." Section 108(B) authorizes HUD to inform the local agency in writing of its objection to a proposed step, and to refuse a requested payment if the agency proceeds without securing the prior approval of the Secretary of HUD.

Section 108 of the Loan and Capital Grant Contract remained applicable in full until March of 1980, when HUD apprised local agencies, including TDRA, that they were no longer required to comply with the data furnishing provisions of that section. Subsequently, TDRA discontinued submitting data previously required by section 108.

We agree with the district court that, at least until March of 1980, the Loan and Capital Grant Contract provided HUD with sufficient authority over the Dover Urban Renewal Plan to constitute major federal action.[5] Specifically, every instance of data submission by TDRA, as required by section 108(A), provided HUD with an opportunity to alter the plan upon a determination that such action would be necessary for compliance with Federal laws or regulations. Thus, we hold that on at least one of the several occasions between January 1, 1970 and March of 1980 when it accepted data submitted by TDRA concerning the Dover Urban Renewal Project, HUD should have complied with the procedural requirements of NEPA and its implementing regulations.[6]

## III. *NHPA*

■ Congress enacted NHPA in 1966 in order to "accelerate [the] historic preservation programs and activities [of the Federal Government], to give maximum encouragement to agencies and individuals undertaking preservation by private means, and to assist state and local governments and the National Trust for Historic Preservation in the United States to expand and accelerate their historic preservation programs and activities". 16 U.S.C. § 470(b)(7) (Supp.1982).

NHPA, like NEPA, is primarily a procedural statute, designed to ensure that Federal agencies take into account the effect of Federal or Federally-assisted programs on

---

5. This Court on several occasions has reserved decision on the proper standard to apply in reviewing an agency decision not to prepare an environmental impact statement. *E.g., Township of Springfield v. Lewis,* 702 F.2d 426, 436 (3d Cir.1983). We need not resolve this issue in the present case, because HUD's failure to follow the requirements of NEPA with regard to the Stone Academy, based on its erroneous interpretation of "major federal action", would be sufficient to constitute unreasonable action, an abuse of discretion, or arbitrary and capricious action. *Cf. NAACP v. Medical Center, Inc.,* 584 F.2d 619, 635 (3d Cir.1978) (Higginbotham, J., concurring) (because agency's interpretation of "major federal action" satisfied even most rigorous possible standard of review, that of reasonableness, unnecessary to decide whether more deferential standard is controlling).

6. Because of our disposition of the NEPA issue, we need not consider whether other events occurring after January 1, 1970 constituted major federal action. We also need not consider whether HUD retained sufficient authority over the Dover Urban Renewal Project after March of 1980, by virtue of the continuing applicability of section 108(B) of the Loan and Capital Grant Contract, to constitute major federal action. *See WATCH v. Harris,* 603 F.2d 310, 317–18, 326 (2d Cir.1979); *Wisconsin Heritages, Inc. v. Harris,* 460 F.Supp. 1120, 1126 (E.D. Wisc.1978) (although much of HUD's involvement in the project was terminated, its control over the remaining funds for demolition of the mansion is sufficient to impose further responsibility under NEPA). Finally, we need not address the district court's ruling that HUD's failure to comply with certain HUD regulations justifies the court's award of injunctive relief.

historic places as part of the planning process for those properties. In this regard, NHPA requires that Federal agencies

> shall, prior to the expenditure of any federal funds on [an] undertaking ... take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation ... a reasonable opportunity to comment with regard to such undertaking."

16 U.S.C. § 470f.

It is undisputed that HUD did not at any time take into account the effect of the Dover Renewal Plan on the Stone Academy, or afford the Advisory Council on Historic Preservation a reasonable opportunity to comment on the project. HUD's position is that the NHPA language "prior to the approval of any federal funds on [an] undertaking" refers only to the original approval of an urban renewal plan and any major amendatory to the plan which requires HUD approval. *See Hart v. Denver Urban Renewal Authority,* 551 F.2d 1178, 1180 (10th Cir.1977); *South Hill Neighborhood Association v. Romney,* 421 F.2d 454, 462 (6th Cir.1969); *cert. denied,* 397 U.S. 1025, 90 S.Ct. 1261, 25 L.Ed.2d 534 (1970), *San Francisco Tomorrow v. Romney,* 472 F.2d 1021, 1025 (9th Cir.1973); *Sworob v. Harris,* 451 F.Supp. 96, 106 (E.D.Pa.1978). HUD argues that its failure to undertake an historic resource review with regard to the Stone Academy did not violate NHPA because the building was neither listed nor eligible for listing in the National Register for Historic Places until 1982, well after the date of original approval of the Dover Urban Renewal Plan, or of any major amendatory to the Plan.

The district court adopted a somewhat broader interpretation of NHPA, holding that the statute applies at every stage where a federal agency retains authority to approve funding for, and to provide a meaningful review of federally assisted projects which affect historic properties.

The court went on to say, *inter alia,* that "[a]s long as HUD retains the authority to make funding approvals and give continuous permission to acquire properties, demolish buildings, and change the Urban Renewal Plan, primarily under Section 108 of the Loan and Capital Grant Contract, Section 106 of the National Historic Preservation Act applies to require HUD and the Advisory Council on Historic Preservation to give weight to the impact which undertakings have upon historic places." *See WATCH v. Harris,* 603 F.2d 310, 326 (2d Cir.1979); *Save the Courthouse Committee v. Lynn,* 408 F.Supp. 1323, 1339 (S.D.N.Y.1975). Again, our standard of review is plenary.

A. *Prior to the Approval of the Expenditure of Any Federal Funds*

We begin the task of discerning the proper interpretation of NHPA by noting that the language of NHPA could accommodate either of the different interpretations urged upon us. As the Second Circuit noted in *WATCH:*

> [Some of the language of NHPA suggests] that even a preliminary authorization [of Federal funds] amounts to a cutoff [date for the application of NHPA]. Thus, the first sentence of § 106 states that a federal agency having jurisdiction over a "*proposed* Federal or federally-assisted undertaking" (emphasis added) shall consider its effect on listed properties. And the language "any" in the phrase "prior to the approval of the expenditure of any Federal funds" might refer to the initial funding only. On the other hand, the language also supports the interpretation that the preliminary approval is not a cut-off. The term "proposed" might simply be shorthand for "proposed or continuing", and "any" might mean any expenditure of federal funds, not the expenditure of initial funds. Moreover, if the statute intended to establish a cutoff once an agency gave preliminary approval to expenditures, one might expect it to read "prior to the approval of the undertaking," rather than prior to the

approval of the expenditure of any Federal funds on the undertaking."

603 F.2d at 320.

Our review of the legislative history of NHPA also reveals no dispositive answer concerning the proper interpretation of the statute's applicability to ongoing projects. *See WATCH v. Harris,* 603 F.2d at 320–323 (summarizing relevant legislative history). The legislative history of NHPA does indicate, however, that Congress designed the statute to draw a meaningful balance between the goals of historic preservation and community development. For example, the House Report accompanying the statute explains that NHPA is an "effort to establish the most effective preservation program possible ..: which is consistent with the necessity for progress within our communities." H.R.Rep. No. 1916, 89th Cong., 2d Sess., *reprinted in* 1966 U.S.Code Cong. & Ad.News 3307, 3309. Later in the same Report, the aim of the statute is described as to strike a "meaningful balance ... between preservation of ... important elements of our national heritage and new construction to meet the needs of our ever growing communities and cities". *Id.*

The interpretation of NHPA adopted by the district court, that NHPA is applicable to an ongoing project at any stage where a Federal agency has authority to approve or disapprove Federal funding and to provide meaningful review of both historic preservation and community development goals, closely parallels the purpose of the statute. By contrast, the interpretation of NHPA suggested by HUD would have the applicability of NHPA turn on fortuitous elements unrelated to the policy goals of the statute, elements such as the date of an ongoing project's initial approval and the possible existence of any major amendatories to the plan.

The district court's interpretation of NHPA is further corroborated by regulations drafted by the Advisory Council on Historic Preservation. These regulations, adopted by HUD, 47 Fed.Reg. 56269 (Dec. 15, 1982), provide that "[a]s early as possible before an agency makes a final decision concerning an undertaking and in any event prior to taking any action that would foreclose alternatives or the Council's ability to comment, the Agency Official shall take [appropriate] steps to comply with the requirements of Section 106 of the National Historic Preservation Act and Section 2(b) of Executive Order 11593." [7] *Id.*

Significantly, Advisory Council regulations define "decision" as "the exercise of or the opportunity to exercise discretionary authority by a federal agency at any stage of an undertaking where alterations might be made in the undertaking to modify its impact upon National Register and eligible properties." 36 C.F.R. § 800.2(h) (1982). "Undertaking" is defined by the Advisory Council as "any Federal, federally-assisted or federally-licensed action, activity, or program or the approval, sanction, assistance, or support of any non-Federal action, activity, or program. Undertakings include new and *continuing projects* ..." 36 C.F.R. § 800.2(c) (1982).

Read together, these Advisory Council regulations require that NHPA be applied to ongoing Federal actions as long as a Federal agency has opportunity to exercise authority at any stage of an undertaking where alterations might be made to modify its impact on historic preservation goals. This stage by stage approach is almost identical to the interpretation of NHPA subscribed to by the district court, and almost wholly at odds with HUD's suggested interpretation.

As the Second Circuit noted in *WATCH v. Harris,* the Advisory Council's regulations are particularly persuasive concerning the proper interpretation of NHPA, given

---

7. The "steps" required by the Advisory Council regulations include, *inter alia,* identifying any properties included or eligible for inclusion in the National Register, and "in consultation with the State Historic Preservation Officer, [applying] the criteria of Effect (§ 800.3(a)) to determine whether the undertaking will have an effect upon the historical, architectural, archaeological, or cultural characteristics of the property that qualified it to meet National Register Criteria." 36 C.F.R. § 800.4(a), (b).

Congress' subsequent consideration of those regulations combined with its failure to change any construction provided for therein. 603 F.2d at 324; *see Udall v. Tallman,* 380 U.S. 1, 17–18, 85 S.Ct. 792, 801–802, 13 L.Ed.2d 616 (1964). According to the Second Circuit, the Senate Report's decision to append two reports of the Advisory Council to a 1976 amendment to NHPA suggests that Congress was aware of the Council's regulations but chose not to change them. *Id.* at 325.

At this later date, we have even more reason to believe that Congress has implicitly approved the Advisory Council's interpretation of NHPA. The House Report accompanying certain 1980 amendments to NHPA demonstrates Congress' knowledge and approval of certain of the Advisory Council regulations with which we are concerned today.

> The Committee also notes that the term "undertaking", as it is used in other sections of the Act, is meant to be used in the same context as described in Section 106. The Advisory Council on Historic Preservation has adopted an acceptable definition within its regulations, published as 36 C.F.R. 800. The Committee intends that the council take a "reasonable effort" approach in guiding Federal agencies in carrying out their preservation responsibilities. This means that the degree of Federal involvement in an undertaking and the relation of that involvement to the effects on an historic property should both be considered when an agency determines the actions it will take, or which it requires an applicant to take, to comply with the provisions of this Act and its implementing regulations.

H.R.Rep. No. 96–1457, 96th Cong., 2d Sess., *reprinted in* 1980 U.S.Code Cong. & Ad. News 6408. Although we are aware of the dangers of inferring Congressional intent from inactivity, we believe it is proper to do so where, as here, the interpretation adopted by the regulations in question is consistent with the purpose of the statute and its legislative history. *See Merrill, Lynch, Pierce, Fenner & Smith v. Curran,* 456 U.S.

353, 381–83, 102 S.Ct. 1825, 1841–42, 72 L.Ed.2d 182 (1982).

HUD's principal objection to the district court's interpretation of NHPA is that it would convert "each review and funding action designed to ensure the integrity of the original project into a new opportunity to delay or halt the project; every action taken by HUD under the contract to make sure that the project is on course will present an opportunity to deflect it. Clearly, this is a construction of the statute which places too great an administrative burden on the urban renewal process." *See South Hill Neighborhood Association v. Romney,* 421 F.2d 454, 462 (6th Cir.1969) (making similar objection in NEPA case).

The Second Circuit dismissed this objection in *WATCH v. Harris* by reasoning that "[s]urely the courts would respect reasonable agency procedures for updating past reviews. Similar requirements under NEPA have not proved unworkable." 603 F.2d at 324 n. 30. Given this Court's well-established tradition of refusing to place upon Federal agencies meaningless and otherwise unreasonable procedural burdens, *see Shiffler v. Schlesinger,* 548 F.2d 96, 104 (3d Cir.1977) (NEPA case), we cannot but agree with the Second Circuit's conclusion.

## B. *Opportunity to Exercise Authority*

■ The district court held that, by virtue of Sections 108(A) and (B) of the Loan and Capital Grant Contract, HUD maintained continuing supervision over the implementation of the Dover Urban Renewal Project sufficient to trigger the requirements of NHPA. The district court made no attempt, however, to correlate the period during which sections 108(A) and (B) were effective with the status of the Stone Academy vis-a-vis the National Register for Historic Places.

As originally enacted in 1966, NHPA required a historical review only of properties that were listed in the National Register. In 1976, however, Congress amended the statute to require Federal agencies to "take into account the effect of [a Federal or Federally-assisted project] on any district,

site, building, structure, or object that is included in *or eligible for inclusion in* the National Register." 16 U.S.C. § 470f (emphasis added). The Advisory Council's regulations define "eligible property" as "any district, site, building, structure, or object that meets the National Register criteria." 36 C.F.R. § 800.2(f) (1982).

Although the Stone Academy was not actually entered in the National Register until May 21, 1982, we believe it met the National Register criteria in 1976, based on the Stone Academy's 1982 inclusion in the National Register. Therefore, in evaluating the authority vested in HUD by the Loan and Capital Grant Contract, our task is to locate at least one occasion in 1976 or thereafter on which HUD could have demanded an alteration of the Urban Renewal Project.

The record shows that between 1976 and 1980, the Town of Dover at regular intervals submitted data to HUD concerning proposals for implementation of the Dover Urban Renewal Plan. By the terms of sections 108(A) and (B) of the Loan and Capital Grant Contract, each of these occasions provided an opportunity for HUD to demand alterations in the Plan, and to withhold Federal funding if the demand was not met. Therefore, we hold that on at least one of these occasions, HUD should have complied with the procedural requirements of NHPA.[8] Consequently, we believe it was not error for the district court to enjoin the demolition of the Old Stone Academy until HUD conducts a historical resource review pursuant to NHPA.[9]

## IV. *Conclusion*

TDRA has not argued that both NEPA and NHPA either cannot or should not be held applicable to the Old Stone Academy. *Cf. WATCH v. Harris,* 603 F.2d at 318 (noting argument); *id.* at 326 (Lumbard, J., concurring) (because NEPA applies to proposed demolition of historic building, no need to consider applicability of NHPA). Current regulations envision that both statutes may be applied simultaneously,[10] and provide procedures by which a single document may often satisfy an agency's responsibilities under both NEPA and NHPA. *See* 36 C.F.R. § 800.9 (1982); 40 C.F.R. §§ 1502.25, 1506.4 (1982).

The district court's order enjoining the demolition of the Old Stone Academy until such time as HUD conducts an historical and cultural resource review of the Academy pursuant to NHPA and an environmental clearance pursuant to NEPA, and presents those studies to the district court for approval upon notice to plaintiff,[11] will be affirmed.

8. We leave open the issue of the proper standard of review of an agency's decision not to engage in any historical review of a project pursuant to NHPA, for essentially the same reason that we do not decide the standard of review under NEPA. *See* note # 5, *supra.*

9. Because of our resolution of this issue, we need not decide whether HUD retained sufficient discretionary authority over the Dover Urban Renewal Project after March of 1980 to render NHPA applicable to the Urban Renewal Project. We also do not address the appellees' suggestions that other events constituted major amendments of the Urban Renewal Project.

10. *See also* 16 U.S.C. § 470h–2(i) (Supp.1982) (nothing in NHPA shall be construed to serve as an exemption from necessity of an environmental impact statement if it should otherwise be required); *Preservation Coalition v. Pierce,* 667 F.2d 851, 850 (9th Cir.1982) (NEPA and NHPA each mandate separate and distinct procedures, and both statutes must be complied with when historic buildings are affected by proposed Federal action).

11. HUD does not contest the portion of the district court's order which requires HUD to present its environmental and historical studies to the district court for approval.